STATE of Wisconsin, Plaintiff-Respondent,

v.

Jennifer L. WARD,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2007AP79–CR. Oral argument January 8, 2009.
—Decided June 30, 2009.*

2009 WI 60

(Also reported in 767 N.W.2d 236.)

For the defendant-appellant-petitioner there were briefs by *T. Christopher Kelly* and *Kelly, Habermehl & Bushaw, S.C.*, Madison, and oral argument by *T. Christopher Kelly.*

For the plaintiff-respondent the cause was argued by *Mark A. Neuser,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. We review an unpublished per curiam decision of the court of appeals,[1] which affirmed the circuit court's judgment[2] convicting defendant Jennifer L. Ward (Ward) of first-degree reckless homicide. The dispositive issue in this case is whether incriminating statements Ward made during the police investigation subsequent to the death of her seven-week old nephew were not voluntary

---

[1] *State v. Ward,* No. 2007AP79–CR, unpublished slip op. (Wis. Ct. App. Apr. 1, 2008).

[2] The Honorable Mark A. Mangerson of Oneida County presided.

and therefore, should have been suppressed. We conclude that once in police custody, Ward knowingly, voluntarily and intelligently waived her Fifth Amendment rights to silence and to counsel and that under the totality of the circumstances, her statements were voluntarily made because neither her personal characteristics nor police conduct resulted in coerced statements. Accordingly, we affirm the decision of the court of appeals.

## I. BACKGROUND

¶ 2. On the morning of December 1, 2004, Ward called 911 to inform police that her seven-week old nephew, who had been left in Ward's exclusive care by the child's parents five days earlier on November 26, 2004, had stopped breathing. Tragically, the child was later pronounced dead. Ward was taken to the hospital along with the child, and once there, was interviewed by Detective Sergeant Glenn Schaepe (Schaepe) of the Oneida County Sheriff's Department.

¶ 3. During this recorded interview, which started at 9:30 a.m., Schaepe repeatedly informed Ward that she was not under arrest, and was free to leave at any time. In addition, hospital personnel came and went at various times throughout the interview. However, Ward's family members were not permitted to enter the room. While Ward was being questioned, she made incriminating statements suggesting that she was responsible for the death of her nephew. Schaepe also told her that her daughter had told him that she had seen Ward shaking the child; however, Ward's daughter saw Ward shake the child only when Ward was administering cardiopulmonary resuscitation (CPR) at the direction of 911 phone staff.

¶ 4. Later that day, at around 2:30 in the afternoon, Ward accompanied the police to an interrogation room at the police station, where she was informed of her rights pursuant to *Miranda v. Arizona,* 384 U.S. 436 (1966). Ward signed a *Miranda* waiver form, and was then questioned for several hours by Schaepe and his partner, Detective Sergeant Jim Wood (Wood). During this interview, Ward made incriminating statements to the police, further implicating her in the death of her nephew.

¶ 5. While Ward was being questioned, Attorney Jeffrey Jackomino (Jackomino), who had been retained by Ward's husband to represent Ward, appeared at the police station and requested to speak with Ward. Schaepe left the interrogation room, spoke with Jackomino, and informed Jackomino that he would not be permitted to speak with Ward because Ward had not personally invoked her right to counsel. Ward never unequivocally asked for an attorney, and Jackomino was never permitted to see Ward while she was being questioned. The officers also did not inform Ward that her husband was outside of the interrogation room, even though she asked several times about him.

¶ 6. Around 5:20 p.m., the detectives ceased questioning, and Ward was informed that she would be spending the night in jail. Schaepe informed Ward that she would not be permitted to make any phone calls, although at approximately 7:00 p.m., Shaepe instructed the jailer to inform Ward that she would be permitted to call a lawyer if she so requested. Ward never asked to call a lawyer.

¶ 7. The following morning, Ward asked to speak with the detectives. She was brought into the interrogation room, and Schaepe and Wood questioned her a third time. Ward again was given *Miranda* warnings.

She asked several times to speak with her husband, but the officers did not permit her to do so. Ward never asked to speak with a lawyer, however, and she once again made incriminating statements implicating herself in the death of her nephew. Ward was subsequently charged with first-degree reckless homicide.

¶ 8. Prior to trial, Ward moved to suppress her statements. She challenged the interview at the hospital, arguing that her statements were involuntary because she had been in pain at the time and had suffered one or more seizures. Ward also argued that her statements were inadmissible because of Schaepe's incomplete and misleading statement about the circumstances under which Ward's daughter said she had seen Ward shaking the baby.

¶ 9. With respect to her statements at the police station, Ward argued that they were involuntary because (1) she was not initially permitted to make phone calls during the night in jail; (2) she was not informed that her lawyer wanted to speak with her; (3) she was not informed of her husband's status and location; and (4) she was not adequately informed of her right to counsel when she discussed calling a lawyer.

¶ 10. The circuit court denied Ward's suppression motion with respect to all three questioning sessions. Regarding the first session in the hospital, the court concluded that Ward was not in custody because her movement was not restricted; she was told several times that she was not under arrest and was free to leave at any time; and hospital personnel were entering and exiting Ward's room on a regular basis. Because Ward was not in custody, *Miranda* warnings were not required, and the circuit court merely considered the voluntariness of Ward's statements under the totality of the circumstances.

¶ 11. The circuit court found that Ward did not possess personal characteristics suggesting that she was particularly susceptible to coercion, and found that Schaepe did not use tactics sufficient to result in coercion. Even though Schaepe did not tell Ward the circumstances under which Ward's daughter said that she saw Ward shaking the baby, the court noted that police deception does not necessarily make subsequent statements inadmissible. As a result, the court held, based on the totality of the circumstances, that Ward's statements were voluntary and therefore admissible.

¶ 12. With respect to the second questioning session, which took place at the police station, the State conceded that Ward was in custody. The circuit court concluded that Ward knowingly, voluntarily and intelligently waived her rights to remain silent and to have counsel present. The court held that Ward's statements made subsequent to that waiver were voluntary because Ward did not possess personal characteristics that made her vulnerable, and the detectives' methods, while aggressive, did not constitute coercion.

¶ 13. The circuit court further held, under the United States Supreme Court's decision in *Moran v. Burbine*, 475 U.S. 412 (1986), that the detectives' failure to inform Ward of Attorney Jackomino's presence outside of the interrogation room did not render her statements inadmissible. In addition, the circuit court concluded that Ward's equivocal statements about calling a lawyer were insufficient to invoke the Fifth Amendment right to counsel. Finally, the court held that the detectives' evasiveness in response to Ward's repeated inquiries regarding her husband did not affect the admissibility of her statements because there is no constitutional right to have anyone other than counsel present during custodial interrogation. In light of all

these circumstances, the court concluded that Ward's statements at the second interview were admissible.

¶ 14. In analyzing the third interview, the circuit court began by noting that even though Ward was initially denied the opportunity to make any phone calls subsequent to the second interview, she was later informed by the jailer that she could call a lawyer if she wished. As a result, the court rejected Ward's argument that she was held "incommunicado." The court once again found that, once the third questioning session actually began, Ward was cognizant of her rights before speaking to the police. As a result, Ward's statements were admissible.

¶ 15. Following denial of Ward's motion to suppress, the case proceeded to trial, and a jury convicted Ward of first-degree reckless homicide. Ward challenged her conviction in the court of appeals, arguing that the circuit court had erred by failing to suppress her statements. She advanced many of the same arguments before the court of appeals that she had put forth in the circuit court. The court of appeals affirmed her conviction.

¶ 16. We granted review and now affirm.

## II. DISCUSSION

A. Standard of Review

¶ 17. Whether a waiver of the rights to silence and to counsel was knowingly, voluntarily and intelligently made is a question of law for our independent review. *State v. Badker,* 2000 WI App 27, ¶ 8, 240 Wis. 2d 460, 623 N.W.2d 142. In deciding whether Ward's incriminating statements should have been sup-

pressed, we must determine whether those statements were made voluntarily. "The question of voluntariness involves the application of constitutional principles to historical facts." *State v. Hoppe,* 2003 WI 43, ¶ 34, 261 Wis. 2d 294, 661 N.W.2d 407. We uphold a circuit court's findings of historical fact unless they are clearly erroneous. *State v. Arias,* 2008 WI 84, ¶ 12, 311 Wis. 2d 358, 752 N.W.2d 748 (citing *State v. Fonte,* 2005 WI 77, ¶ 11, 281 Wis. 2d 654, 698 N.W.2d 594). A finding of historical fact is not clearly erroneous unless "it is against the great weight and clear preponderance of the evidence." *State v. Sykes,* 2005 WI 48, ¶ 21 n.7, 279 Wis. 2d 742, 695 N.W.2d 277 (quoting *State v. Tomlinson,* 2002 WI 91, ¶ 36, 254 Wis. 2d 502, 648 N.W.2d 367). We independently review the application of constitutional principles to those facts. *Sykes,* 279 Wis. 2d 742, ¶ 12 (citing *State v. Vorburger,* 2002 WI 105, ¶ 32, 255 Wis. 2d 537, 648 N.W.2d 829).

B. General Principles

¶ 18. There are "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment." *Dickerson v. United States,* 530 U.S. 428, 433 (2000) (citing *Bram v. United States,* 168 U.S. 532, 542 (1897); *Brown v. Mississippi,* 297 U.S. 278 (1936)).[3] Ward's statements were voluntary if they were "the product of a free and uncon-

---

[3] Our interpretation of Article I, Section 8 of the Wisconsin Constitution has generally been consistent with the United States Supreme Court's interpretation of the Fifth Amendment to the federal Constitution. *State v. Arias,* 2008 WI 84, ¶ 19,

strained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." *State v. Davis,* 2008 WI 71, ¶ 36, 310 Wis. 2d 583, 751 N.W.2d 332 (quoting *Hoppe,* 261 Wis. 2d 294, ¶ 36). In conducting this inquiry, we look at the totality of the circumstances. *Id.,* ¶ 37.

¶ 19. The totality of the circumstances contemplates balancing the characteristics of the suspect against the type of police tactics that were employed to obtain the suspect's statement. *Id.* (citing *Hoppe,* 261 Wis. 2d 294, ¶¶ 38–39). In evaluating the suspect's characteristics, we consider his or her "age, education, intelligence, physical or emotional condition, and prior experience with law enforcement." *Id.* (same). The more sophisticated and less vulnerable the suspect is, the more likely it becomes that his or her statements were voluntary.

¶ 20. In evaluating the police conduct, we examine "the length of questioning, general conditions or circumstances in which the statement was taken, whether any excessive physical or psychological pressure was used,

311 Wis. 2d 358, 752 N.W.2d 748. However, on occasion we have interpreted Article I, Section 8 more broadly. *See State v. Knapp,* 2005 WI 127, ¶ 56, 285 Wis. 2d 86, 700 N.W.2d 899; *State v. Dubose,* 2005 WI 126, ¶¶ 40–44, 285 Wis. 2d 143, 699 N.W.2d 582. Here, we interpret Article I, Section 8 of the Wisconsin Constitution consistent with the United States Supreme Court's interpretation of the Fifth Amendment. *State v. Hanson,* 136 Wis. 2d 195, 213, 401 N.W.2d 771 (1987); see also *infra* note 5.

and whether any inducements, threats, methods, or strategies were utilized in order to elicit a statement from the defendant." *Id.* (citing *Hoppe,* 261 Wis. 2d 294, ¶ 39).

¶ 21. The ultimate question of whether Ward's statements to police were voluntarily made is analyzed under the teachings of *State ex rel. Goodchild v. Burke,* 27 Wis. 2d 244, 133 N.W.2d 753 (1965). However, many of the arguments that Ward makes are phrased in a manner that also appears to question the voluntariness, and therefore the validity, of the waiver of her rights to remain silent and to have counsel provided. Those are rights explained during the *Miranda* warnings she was given. In order to avoid potential confusion of the two kinds of voluntariness that arise in this case, we separately analyze the validity of Ward's waiver of rights when the *Miranda* warnings were given and then examine the voluntariness of her statements. In some instances, this will require us to discuss her contentions twice, once in order to analyze her waiver of the rights contained in the *Miranda* warnings, and a second time to analyze the effect of her contention on the voluntariness of her statements.

C. Police Interviews

1. Personal characteristics

¶ 22. With respect to Ward's personal characteristics, the circuit court found that she was relatively sophisticated and intelligent. This was not a clearly erroneous finding, and is supported by the record. First, Ward was 35 years old at the time of these interviews, and was a high school graduate. Second, the interview

transcripts do not suggest any lack of intelligence; Ward evinced a strong command of language. Third, Ward had a prior conviction, and she is the daughter of a police officer. *State v. Franklin,* 228 Wis. 2d 408, 413, 596 N.W.2d 855 (Ct. App. 1999). For example, the following dialogue occurred when Ward was read her *Miranda* warnings the first time:

[Schaepe]: . . . [N]umber one. You [] have the right to remain silent. Do you understand that?

[Ward]: Yes.

[Schaepe]: Okay.

[Ward]: You have the right to an attorney.

[Schaepe]: What's that?

[Ward]: If you cannot afford an attorney one will be appointed for you.

[Schaepe]: Oh you know [] 'em pretty well?

[Ward]: Yeah.

That is, Ward herself demonstrated an unprompted understanding of her rights while in custody without having first been told those rights by the police. This indicates that Ward was not particularly vulnerable to police questioning.

¶ 23. Ward's only basis for challenging the voluntariness of her statements based on her own personal characteristics relates to her allegations of suffering seizures and experiencing back pain while at the hospital during the first questioning session. However, the circuit court made a finding of historical fact on this point, noting:

·There's no reason to believe that this perceived seizure earlier in the day and some confusion perhaps based on

the excitement of the events made her particularly vulnerable to interrogation. . . . [T]here is really insufficient proof for this court to determine that her back pain or any type of seizure [was] actually [a]ffecting her ability to respond appropriately to Officer Schaepe. There is no real proof that those medical problems made her particularly vulnerable . . . .

This finding does not go "against the great weight and clear preponderance of the evidence," i.e., it was not clearly erroneous. *Sykes,* 279 Wis. 2d 742, ¶ 21 n.7 (quoting *Tomlinson,* 254 Wis. 2d 502, ¶ 36).

¶ 24. Therefore, Ward's physical and mental condition did not cause her to become vulnerable to police interrogation. As a result, *none* of Ward's personal characteristics favor concluding that her statements were made involuntarily.

2. Police conduct

¶ 25. Ward's remaining basis for suppression lies in her contention that Schaepe's and Wood's police tactics resulted in coerced statements. Ward was interviewed by the police on three occasions. We review each in turn.

a. first interview

¶ 26. Ward concedes that she was not in custody at the hospital, so Schaepe had no obligation to provide *Miranda* warnings. *State v. Brockdorf,* 2006 WI 76, ¶ 39, 291 Wis. 2d 635, 717 N.W.2d 657 (holding that the police are not required to give *Miranda* warnings if the suspect is not in custody). Ward does not argue that a *Miranda* violation occurred at this time.

¶ 27. Instead, Ward asserts that Schaepe's conduct rose to the level of coercion because he told her that her daughter had seen her shaking the baby, but he did not tell her all that her daughter said about that event. In addition, Ward argues that she was coerced because her family members were not allowed to enter the hospital room while Schaepe questioned her. The description of the "shaking" episode to which Schaepe referred, but incompletely described, was Ward's daughter describing Ward's CPR on the baby at the direction of 911 staff. As a result, although Schaepe's statement was true, because of its incompleteness, Schaepe misrepresented what Ward's daughter said. However, misrepresentations by police "do not necessarily make a confession involuntary"; rather, they are a relevant factor in the totality of the circumstances. *State v. Triggs,* 2003 WI App 91, ¶ 17, 264 Wis. 2d 861, 663 N.W.2d 396 (citing *United States v. Velasquez,* 885 F.2d 1076, 1088 (3d Cir. 1989)); *see also Frazier v. Cupp,* 394 U.S. 731, 739 (1969) (concluding that while it was relevant that police misrepresented facts to the suspect, those misrepresentations were insufficient to make an otherwise voluntary confession inadmissible); *State v. Fehrenbach,* 118 Wis. 2d 65, 66–67, 347 N.W.2d 379 (Ct. App. 1984) (concluding "that an interrogator's use of deceit, while relevant, does not by itself make an otherwise voluntary confession inadmissible") (citing *Frazier,* 394 U.S. at 739).

¶ 28. Even though this misrepresentation is relevant in determining the voluntariness of Ward's statements, it is insufficient to render her statements involuntary. Ward repeatedly denied shaking the baby, and would acknowledge only later that she had "tossed" or "plopped" the child on the bed, actions inconsistent with

Schaepe's description of Ward's daughter's statement. In addition, the effect of denying Ward's family members access to Ward's hospital room was minimal, as hospital personnel were frequently entering and exiting the room throughout the interview, and Schaepe told Ward that she could stop the interview at anytime. The rest of the interview at the hospital was relaxed, with Ward and Schaepe at times joking with one another. As a result, the tone of the interview was conversational and indicates that it was not coercive. Accordingly, we conclude, under the totality of the circumstances, that the statements Ward made at the hospital were voluntary.

b. second interview

¶ 29. The second interview took place at the police station. The State has conceded that Ward was in custody during this interview. As a result, prior to interrogating Ward, the detectives were required to administer *Miranda* warnings. They did so. The following dialogue recounts the reading of those rights, and Ward's subsequent waiver of them:

> [Schaepe]: . . . [N]umber one. You[] have the right to remain silent. Do you understand that?
>
> [Ward]: Yes.
>
> [Schaepe]: Okay.
>
> [Ward]: You have the right to an attorney.
>
> [Schaepe]: What's that?
>
> [Ward]: If you cannot afford an attorney one will be appointed for you.
>
> [Schaepe]: Oh you know [] 'em pretty well?

[Ward]: Yeah.

[Schaepe]: Okay. Number two. Anything you say can be used against you in a court of law. Do [you] understand that?

[Ward]: Yes I do.

[Schaepe]: Okay. Number three. You have the right to consult with a lawyer before questioning and to have a lawyer present with you during questioning. Do you understand that?

[Ward]: Does that mean I need a lawyer right now?

[Schaepe]: Well see that's a decision that you make. I can't make those decisions for you. What I'm saying is that we do wanna ask you about the death of [your nephew]. And you are here. We didn't bring you here in handcuffs. We asked you to come here and you were gracious enough to come with us and sit here and uh . . .

[Ward]: Well I . . .

[Schaepe]: . . . listen to us.

[Ward]: . . . I'm sorry. This is law enforcement so if I get up and leave I feel like I'm doing something wrong.

[Schaepe]: Oh. Well you can . . .

[Ward]: That's me.

[Schaepe]: . . . you can do that right?

[Ward]: What?

[Schaepe]: Ya know get up and leave if that's what you want.

[Ward]: I can?

324

[Schaepe]: Sure.

[Ward]: Where am I gonna go?

[Schaepe]: *(Laughing)* Well . . .

[Ward]: I I have no ride *(laughing)*.

[Schaepe]: . . . well uh we're . . .

[Ward]: 'Cuz I don't know where my husband is.

[Schaepe]: Well a ride could be uh afforded you uh somehow.

[Ward]: Okay.

[Schaepe]: But if we . . .

[Ward]: But I I'm sorry to interrupt. But I told you I wanna try to get this taken care of as quickly and as soon as possible that way everything like you said is fresh.

[Schaepe]: Okay. And [] that's what I understood you to say before. And that's [] why I would like to talk to you yet and uh I understand what you just said. Um in any event you understood that statement I read to you. You have the right to consult with a lawyer before questioning and to have a lawyer present with you during questioning.

[Ward]: Yes.

[Schaepe]: Okay. And number four. You cannot if you cannot afford to hire [] a lawyer one would be appointed to represent you at public expense before or during any questioning if you so wish. Do you understand that?

[Ward]: Yes.

[Schaepe]: Okay. And then number five. If you decide to answer questions now without a lawyer present you

have the right to stop the questioning and remain silent at any time you wish and the right to ask for and have a lawyer any time you wish including during the questioning. Okay?

[Ward]: (No verbal response) *(Head shake up and down—affirmative).*

[Schaepe]: And then I'll just turn this to you and uh there's a Waiver of Rights right below it. Maybe you can just follow along. Okay. I'll read it to ya though.

[Ward]: Sorry.

[Schaepe]: That's alright. I have read or have had read to me the statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

[Ward]: True.

Ward then signed the *Miranda* waiver form and proceeded to make incriminating statements.

██ ██

¶ 30. In order to be valid, a *Miranda* waiver must be knowing, voluntary and intelligent. *See Burbine,* 475 U.S. at 421. A waiver is knowing, voluntary and intelligent where it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and has "been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Here, Ward verbally, and by her signature, acknowledged that her *Miranda* waiver was obtained without any promises, threats, pressure or coercion. *North Carolina v. Butler,*

441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver . . . .").

¶ 31. It is apparent from the above dialogue that Ward's waiver was valid. Ward understood her rights, even reciting them unprompted while Schaepe was administering *Miranda* warnings to her. Ward understood what she was giving up, and made a conscious decision to make a statement to the police despite her right to remain silent. As a result, we conclude that Ward's waiver of her rights was knowing, voluntary and intelligent.

¶ 32. Nevertheless, Ward attacks the admissibility of statements she made subsequent to her waiver, arguing that those statements were made involuntarily because they were coerced. *Dickerson,* 530 U.S. at 444 ("The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry."); *but see id.* ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." (quoting *Berkemer v. McCarty,* 468 U.S. 420, 433 n.20 (1984))).

¶ 33. Ward's arguments can be broken down as follows: (1) she should have been informed that Attorney Jackomino was waiting to talk to her outside of the interrogation room; (2) she should have been informed about the status and location of her husband, who was also waiting outside; and (3) the police should have asked for further clarification from and given further information to Ward when she made equivocal state-

ments about contacting an attorney.[4] We note that, while Ward makes these arguments in an attempt to show that her statements were not voluntary, these arguments are more appropriately addressed to the validity of her waiver. Nevertheless, under the totality of the circumstances, this police conduct does not rise to the level of coercion, and police coercion is a necessary prerequisite to finding that a defendant's statement was involuntarily made. *Hoppe,* 261 Wis. 2d 294, ¶ 37 (citing *Colorado v. Connelly,* 479 U.S. 157, 167 (1986)). We therefore reject Ward's arguments in turn.

¶ 34. Ward's first contention, that her waiver was invalid because the police failed to inform her that Attorney Jackomino was waiting outside, is squarely addressed by the United States Supreme Court's decision in *Burbine,* which we adopted in *State v. Hanson,* 136 Wis. 2d 195, 213, 401 N.W.2d 771 (1987). In *Burbine,* the Supreme Court held that the police's failure to inform a suspect that his attorney was attempting to call him, and the police's deliberate deception of the attorney in stating that they would wait for him to arrive before questioning his client, did not affect the suspect's knowing, voluntary and intelligent waiver of his Fifth Amendment rights to remain silent and have counsel present. *Burbine,* 475 U.S. at 423–24. The Court held that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right."

---

[4] Ward also asserts that, at the second interview, Schaepe again made misleading statements regarding Ward's daughter's description of Ward shaking the baby. Our conclusions on this point with respect to the first interview apply with equal force to the second interview. *See supra* ¶¶ 27–28.

*Id.* at 422. In language directly applicable here, the Court further stated:

> Granting that the "deliberate or reckless" withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. Because respondent's voluntary decision to speak was made with full awareness and comprehension of all the information *Miranda* requires the police to convey, the waivers were valid.

*Id.* at 423–24.

¶ 35. As we noted in *Hanson,* "the United States Supreme Court has imposed on the police an obligation to inform a suspect of his right to have counsel present at a custodial interrogation. . . . The Fifth Amendment, however, does not require the police to advise the suspect of the immediate availability of a particular attorney." *Hanson,* 136 Wis. 2d at 208.

¶ 36. In this case, nothing in the record suggests that Ward was not fully apprised of her rights, and no authority required Schaepe and Wood to tell her that Jackomino was there. Furthermore, as we have already concluded above, the colloquy between Ward and Schaepe as Ward was read her rights indicates that Ward's "voluntary decision to speak was made with full awareness and comprehension of all the information *Miranda* requires the police to convey." *Burbine,* 475 U.S. at 424. Accordingly, the fact that the police did not inform Ward that Jackomino was outside did not affect the validity of her waiver.

▮▮▮

¶ 37. In addition, this fact did not affect the voluntariness of Ward's subsequent statements. In or-

der for police conduct to be coercive, "the pressures brought to bear on the defendant by representatives of the State [must] exceed[] the defendant's ability to resist." *Davis,* 310 Wis. 2d 583, ¶ 36 (quoting *Hoppe,* 261 Wis. 2d 294, ¶ 36). However, that the police did not tell Ward about Jackomino brought no additional pressures to bear on Ward. Therefore, this lack of knowledge did not affect, much less exceed, her ability to resist police questioning. She simply was unaware of this circumstance. Accordingly, the fact that the police did not inform Ward of Jackomino's presence is not a relevant factor, under the totality of the circumstances, in regard to whether her statements were voluntary.

■■■

¶ 38. Ward's second basis for challenging her *Miranda* waiver, which she also characterizes as a challenge to the voluntariness of her statements subsequent to that waiver, is the detectives' "evasiveness" in response to Ward's questions regarding the status and location of her husband, who, unknown to Ward, was actually waiting outside the interrogation room. Ward now argues that, had she been permitted to speak with her husband, he might have advised her to invoke her rights. However, as we have explained:

> Since the right to counsel and the right to remain silent are given by the constitution to the defendant, he alone can exercise those rights. Neither his family nor his attorney are threatened with accusations, nor do they have the defendant's knowledge of the case, including the defendant's knowledge of his own guilt or innocence, nor are they subject to the pain of the defendant's possibly guilty conscience. Therefore, no one but the accused can make the decision to make a statement to the police or to ask for the assistance of counsel in making his decision.

*Hanson,* 136 Wis. 2d at 213. It was Ward's responsibility, not her husband's, to determine whether she wanted to exercise her Fifth Amendment rights. *Id.*

¶ 39. A request to speak with family members triggers no constitutional rights in the manner that a request to speak with counsel does, and under *Burbine,* the police had no obligation to inform Ward that her husband was waiting outside. As a result, Ward's second argument does not affect the validity of her waiver of rights.

¶ 40. We also note that the police's failure to inform Ward of the status and location of her husband did not affect the voluntariness of statements Ward made subsequent to her waiver of rights. That is, failing to give Ward this information did not place additional pressure on her, sufficient to overcome her free will. In order for police conduct to be coercive, it must be shown to be the type of conduct that prevents a defendant's statements from being "the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation." *Davis,* 310 Wis. 2d 583, ¶ 36. Ward would have made incriminating statements if her husband had in fact been unavailable, as he very well could have been. Therefore, no coercion occurred due to the detectives' responses to Ward's inquiries regarding her husband. Stated otherwise, the detectives' conduct did not defeat the voluntariness of Ward's statements subsequent to her waiver of rights.

¶ 41. We note that the circumstances here are distinguishable from our decision in *State v. Jerrell C.J.,* 2005 WI 105, 283 Wis. 2d 145, 699 N.W.2d 110, where we held that refusing Jerrell's (a juvenile) request to speak with his parents prior to custodial interrogation,

under the totality of the circumstances, rendered his subsequent statements involuntary. *Id.*, ¶ 43 (holding that the "failure 'to call the parents for the purpose of depriving the juvenile of the opportunity to receive advice and counsel' will be considered 'strong evidence that coercive tactics were used to elicit the incriminating statements' " (quoting *Theriault v. State,* 66 Wis. 2d 33, 48, 223 N.W.2d 850 (1974))).

¶ 42. The holding in *Jerrell* was based in substantial part on the suspect's status as a juvenile. *Id.* Ward is not a juvenile; she is an adult of average intelligence and education, with an above average familiarity with law enforcement procedures. As a result, under the totality of the circumstances, Schaepe and Wood did not have an obligation to contact Ward's husband in order for Ward's statements to be voluntary.

¶ 43. Ward's third argument is that when she asked Schaepe and Wood if she should call an attorney, their failure to further clarify her statements and further explain her rights rendered her waiver of rights invalid, and her subsequent incriminating statements involuntary. However, all Ward had to do was unequivocally ask for an attorney. Had she done so, Schaepe and Wood would have been obligated to immediately cease all questioning. *Edwards v. Arizona,* 451 U.S. 477, 484–85 (1981) ("[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."); *State v. Jennings,* 2002 WI 44, ¶ 26, 252 Wis. 2d 228, 647 N.W.2d 142 ("[T]he police must immediately cease questioning a suspect who clearly invokes the *Miranda* right to counsel at any point during custodial interroga-

tion."). Ward did not do this. Instead, she asked the detectives what they thought she should do. This is an equivocal statement. We have provided guidance in the past directly on this point:

> If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.

*Jennings,* 252 Wis. 2d 228, ¶ 29 (quoting *Davis v. United States,* 512 U.S. 452, 459 (1994) (emphasis in original)). That is, Ward's equivocal reference to an attorney, by asking the officers if she should call one, did not require Schaepe and Wood to cease questioning Ward.[5] In addition, the officers had no need to clarify Ward's statements regarding whether to call an attor-

---

[5] We note that, after a defendant has been formally charged, the Sixth Amendment right to counsel applies, and in contrast to the Fifth Amendment right to counsel, an equivocal request for counsel in a Sixth Amendment context is sufficient to invoke that right. *See State v. Hornung,* 229 Wis. 2d 469, 477–78, 600 N.W.2d 264 (Ct. App. 1999) (concluding that the "strict requirements for 'unequivocally and unambiguously' asserting one's right to counsel under the Fifth Amendment are somewhat less stringent under the Sixth Amendment") (citing *Patterson v. Illinois,* 487 U.S. 285, 290–91 (1988)); *see also State v. Dagnall,* 228 Wis. 2d 495, 504–05, 596 N.W.2d 482 (Ct. App. 1999) (reasoning that greater leeway is afforded charged defendants in invoking the right to counsel under the Sixth Amendment than uncharged suspects under the Fifth Amendment).

The court of appeals discussed this distinction in *Hornung. Hornung,* 229 Wis. 2d at 477–78. In *Hornung,* the court held that Hornung's equivocal request to speak with an attorney was sufficient to invoke the Sixth Amendment right to counsel, *id.* at 479–80, because Hornung had been charged with a crime, *id.*

ney. *Id.*, ¶ 32 ("[O]fficers need neither stop an interrogation nor ask clarifying questions when a suspect

at 476. In the case now before us, Ward's equivocal statements about an attorney took place in a pre-charging custodial interrogation. Therefore, we have examined her statements and the police's responses to them under Fifth Amendment jurisprudence.

Justice Crooks' dissent acknowledges this distinction, Justice Crooks' dissent, ¶¶ 92–94, but nevertheless urges the court to interpret Article I, Section 8 of the Wisconsin Constitution more broadly than the Fifth Amendment to the federal Constitution, such that a suspect would not be required to make an unequivocal request for counsel in the pre-charging context in order to invoke the right to counsel under state law. We decline to do so.

The United States Supreme Court has noted that stronger protections exist in the Sixth Amendment context than in the Fifth Amendment context. This distinction has been made because when a defendant has been formally charged, "the government has committed itself to prosecute, and [it is] only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *United States v. Gouveia,* 467 U.S. 180, 189 (1984) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689 (1972)).

Furthermore, while we are sensitive to Justice Crooks' concerns about Ward's rights, the loss of life of a young child is an equally compelling concern. This seven-week old boy was in Ward's exclusive care five full days before he died. We acknowledge the significant concerns present in ensuring that a suspect's rights are honored; however, there are significant countervailing concerns in the effective investigation of crimes and the meaningful interrogation of criminal suspects. *Moran v. Burbine,* 475 U.S. 412, 426 (1986) (" '[T]he need for police questioning as a tool for effective enforcement of criminal laws' cannot be doubted." (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 225 (1973))); *id.* ("Admissions of guilt are more than merely 'desirable,' . . . they are essential to society's compelling interest in finding, convicting, and punishing those who violate

makes an equivocal request for counsel.") (citing *Davis,* 512 U.S. at 461).

¶ 44. However, in response to Ward's question, Schaepe did provide Ward with further information about her right to counsel, even though he was not required to do so. Schaepe stated, "Well see that's a decision that you make. I can't make those decisions for you." This is a completely accurate statement of Ward's rights. As we stated in *Hanson,* "no one but the accused can make the decision to make a statement to the police or to ask for the assistance of counsel in making his decision." *Hanson,* 136 Wis. 2d at 213. It was up to *Ward,* not Schaepe or Wood, to decide whether to call an attorney. Since Ward's statements were equivocal, Schaepe and Wood had no obligation to cease questioning or to ask Ward to clarify her statements. Accordingly, this conduct did not affect the validity of Ward's waiver of rights at the second interview.

■■■

¶ 45. In addition, the officers' conduct cannot be said to have rendered Ward's subsequent statements involuntary. The officers gave Ward additional information. They were hesitant to speak with her without being certain she wanted to talk with them. Accordingly, she was not coerced and no remedy of suppression is available for these statements. *Hoppe,* 261 Wis. 2d 294, ¶ 37 (citing *Connelly,* 479 U.S. at 167) (explaining that police coercion is a necessary prerequisite for a finding of involuntariness).

the law.") (citing *United States v. Washington,* 431 U.S. 181, 186 (1977)). Justice Crooks discusses a variety of circumstances surrounding shaken infant deaths, Justice Crooks' dissent, ¶ 84 n.4, but this discussion fails to acknowledge the fact that this child was in Ward's exclusive care not just on the day that he tragically died, but for the five days prior to his death.

### c. night in jail

¶ 46. Ward's second interview ended at approximately 5:20 p.m. Wood and Schaepe explained to Ward that she would be spending the night in jail because she had implicated herself in the death of her nephew. They also told Ward the following:

> [Schaepe]: And what we're gonna do also just so you know is your phone calls are gonna be restricted at this time. So I'm gonna tell them that. And then tomorrow morning we'll assess that and [] see if we can lift that or not. But right now we're in the process of investigating and we're gonna be searching your house. And we don't want any interference with that type of activity so we are restricting your phone calls until tomorrow and then we'll reassess. Okay?
>
> [Ward]: And that means not making any phone calls?
>
> [Schaepe]: Right.

Ward argues that because she could not make any phone calls, she was held "incommunicado" and denied her right to counsel.

¶ 47. In response, the State notes that at approximately 7:00 p.m., Schaepe told the jailer to tell Ward that she could call a lawyer if she wanted. Ward argues that there is no evidence in the record to support this. However, the circuit court made the following finding of fact:

> [O]fficer Schaepe told the jailer about 7 o'clock on the evening of December 1st that of course if [Ward] wanted to call an attorney she could call an attorney, and the evidence here on record is that that information was communicated to her. So on the night of December 1st, [Ward] was reminded that she could call an attorney . . . .

336

¶ 48. Ward argues that this finding is clearly erroneous because there is no evidence that Ward was informed by the jailer that she could call an attorney. We disagree. On the morning of December 2, at the start of the third interview, Ward and Schaepe had the following exchange:

[Schaepe]: The only restrictions that you've had up until this point is calling out to make a personal phone call. Um if you want an attorney you can call an attorney and that's what it says there. At any time you can call an attorney. And that's why the jailer came to you yesterday as well and said that um you don't have any you can't have any personal phone calls out but you can have a phone call to your attorney if you'd like. That's what he told you last night too.

[Ward]: And I didn't have one. And I didn't know who to call. And usually they're gone by that time.

When Schaepe recalled to Ward that the jailer had told her that she could call an attorney if she wanted, Ward did not deny that this was true, and her statements imply that the jailer did tell her she could make a call to a lawyer. Therefore, the circuit court's finding does not go "against the great weight and clear preponderance of the evidence"; i.e., it is not clearly erroneous. *Sykes,* 279 Wis. 2d 742, ¶ 21 n.7.

¶ 49. Satisfied with the circuit court's findings of fact, we note that the concept of "incommunicado" detention, to which Ward argues she was subjected, may contemplate both that visitors, such as family members and/or counsel, are prevented from seeing or contacting the suspect, and that the suspect is prohibited from communicating with individuals other than the police. *See, e.g., Davis v. North Carolina,* 384 U.S. 737, 745

337

(1966) (noting that a defendant was held incommunicado where there was an instruction not to permit anyone access to Davis and not to allow him to communicate with others); *Payne v. Arkansas,* 356 U.S. 560, 563 (1958)[6] (noting incommunicado status where defendant's family members and lawyer were not permitted to visit him and he asked to make a phone call but was not allowed to do so).

¶ 50. However, in *Burbine,* which provided guidance on the application of *Miranda,* the United States Supreme Court explained that, where the dictates of *Miranda* are otherwise followed, the only impermissible aspect of incommunicado questioning is that which prevents a suspect from speaking with those to whom he or she has a constitutional right to speak.[7]

---

[6] *Davis v. North Carolina,* 384 U.S. 737 (1966) and *Payne v. Arkansas,* 356 U.S. 560 (1958), arose prior to *Miranda v. Arizona,* 384 U.S. 436 (1966). Therefore, the analysis employed by the United States Supreme Court differed from the analysis that has been employed in cases that arose subsequent to *Miranda.*

[7] In his dissent, Justice Crooks cites several pre-*Burbine* cases in support of his argument that Ward's detention here was incommunicado in an impermissible manner because visitors, including Ward's attorney and daughter, were not permitted to contact her. Justice Crooks' dissent, ¶¶ 77–79, 81. However, our decision today operates under the holding of *Burbine,* which we adopted in *Hanson,* 136 Wis. 2d at 213. We decline to apply the pre-*Burbine,* pre-*Hanson* case law cited by Justice Crooks. As his opinion expressly notes, *Burbine* "undoubtedly cleared the way" for the conclusions we reach here. Justice Crooks' dissent, ¶ 88. He is correct.

Justice Crooks also cites pre-*Burbine* case law to argue that by declining to permit Ward to contact her husband, the police created a coercive interrogation environment that rendered her

*Burbine,* 475 U.S. at 433 n.4 (noting that denying visitors the right to contact an individual in custody who has been given the *Miranda* warnings will not require suppression because the *Miranda* decision itself "embodies a carefully crafted balance designed to fully protect *both* the defendant's and society's interests," and " 'the interrogation must cease until an attorney is present' *only* '[i]f the individual states that he wants an attorney' " (quoting *Michigan v. Mosley,* 423 U.S. 96, 104 n.10 (1975) (emphasis in *Burbine*)). That is, preventing others from contacting the suspect has no impact on the suspect's ability to waive his or her rights or on his or her choice to speak voluntarily with the police. *Id.* at 422.

¶ 51. The *Burbine* court reasoned that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on

statements involuntary. *Id.,* ¶¶ 77–78. However, *Burbine* expressly notes that " 'the interrogation must cease . . .' *only* '[i]f the individual states that he wants an attorney.' " *Burbine,* 475 U.S. at 433 n.4 (quoting *Michigan v. Mosley,* 423 U.S. 96, 104 n.10 (1975)).

Accepting Justice Crooks' approach would create a slippery slope in which the subjective characteristics of individual suspects would require law enforcement to determine whether the family members and acquaintances with whom the suspect wished to speak were sufficiently important to the suspect such that a denial of contact would render subsequent statements involuntary. For example, Justice Crooks suggests that Ward's statements are involuntary here because she could not talk to her husband. Would her statements also have been involuntary had she asked to speak with her uncle, or with her coworker, or with her minister? We decline to venture into such a tangled web. The state and federal Constitutions provide suspects with the right to have counsel present whenever the suspect requests a lawyer. That right was not infringed upon here.

the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* That is, although the accused has a Fifth Amendment right to be free from compelled self-incrimination, his or her decision to waive that right and to speak voluntarily with the police cannot be affected by events of which he or she has no knowledge. *Id.* Therefore, if the suspect is unaware that the police have prevented someone from making contact, this fact has no bearing on the suspect's waiver of rights or the voluntariness of his or her statements. Once *Miranda* has been followed, "full comprehension of the rights to remain silent and request a [lawyer] are sufficient to dispel whatever coercion is inherent in the interrogation process." *Id.* at 427.

¶ 52. Based on these principles and the circuit court's findings, we conclude that Ward is correct in asserting that she was held in a constitutionally impermissible status during the hour and 40 minutes that she could not contact a lawyer, if she had asked to do so. However, preventing others from contacting Ward cannot have affected her waiver of rights or the voluntariness of her statements, because she was not aware that anyone was trying to contact her. *Id.* at 422. Furthermore, as soon as Ward was informed by the jailer that she could contact a lawyer, her constitutionally impaired status ceased and she was once again free to speak with a lawyer if she requested to do so. *Id.* at 433 n.4. And finally, this is not a case where Ward was held by the police for an extended period of time. She agreed to accompany the police to the station in the afternoon of the day that her nephew died; she was kept overnight; and she was charged the next day.

¶ 53. However, even though Ward was allowed to call a lawyer, she made no attempt to do so at any time.

Even assuming that Ward would have attempted to contact an attorney between 5:20 p.m. and 7:00 p.m. on December 1, the remedy for her brief deprivation of the right to contact a lawyer would be suppression of any incriminating statements that she made during that time. *See Darwin v. Connecticut,* 391 U.S. 346, 349 (1968) (per curiam) (holding that prolonged "incommunicado" interrogation rendered confession made during that period involuntary and inadmissible); *see also Haynes v. Washington,* 373 U.S. 503, 514 (1963) (holding that "incommunicado detention" rendered confession made during that period involuntary). However, Ward made *no statements,* much less incriminating statements, during the hour and 40 minutes that she may have been unable to contact an attorney had she so desired.

¶ 54. We acknowledge that *Darwin* and *Haynes* did not expressly address the question of whether a period of impermissible detention could nevertheless result in the suppression of incriminating statements obtained subsequent to that detention. However, even if it could, Ward's conduct at the third interview in this case (which we discuss below), in personally requesting to speak with the officers, demonstrating a clear willingness to talk once the interview began, and subsequently waiving her rights to silence and to counsel, demonstrate that, under the totality of the circumstances, her brief period of impermissible detention did not affect the voluntariness of statements she made subsequent to that detention. That is, because it was for such a brief period of time, it did not rise to a level of coercion such that statements that she made the next day should have been suppressed.

¶ 55. In his dissent, Justice Crooks argues, both expressly and impliedly, that we should reject the United States Supreme Court's holding in *Burbine* and

conclude that the police conduct here rendered both Ward's waiver invalid and her subsequent statements involuntary. Justice Crooks' dissent, ¶¶ 80, 85, 101 & n.15. In response, we note that in *State v. Hanson,* which is not a recent case and which demonstrates that many of the arguments presented by Justice Crooks are not new, six justices took the opportunity to expressly adopt the holding in *Burbine. Hanson,* 136 Wis. 2d at 213. The *Hanson* court's logic in doing so applies with equal force today:

> We do not believe that the suspect's knowledge of the location of a particular counsel can affect the intelligent waiver of his constitutional rights as described in *Miranda* warnings. Since the knowledge of the location of counsel adds no constitutional rights, does not alter the facts of the case as the suspect knows them, and does not give rise to any coercive influence by the police, such knowledge is not relevant to the suspect's voluntary decision to waive his rights. Although a suspect who was ready to waive his rights might change his mind when told an attorney was waiting to see him, the critical factor would be the convenience of seeing the attorney, not the intelligent perceived need for legal counsel. Since the convenience of the defendant is not constitutionally protected, the location of a particular attorney is not constitutionally required information.

> If this information were required, distinctions between suspects would unfairly develop depending on whether third persons were able to engage the services of an attorney. A new area of law would develop regarding actions of police in particular fact situations, *i.e.,* was the attorney in the building, was the attorney on the telephone, was the attorney on his way to the building, was the attorney not immediately available but would be by a definite time, would a substitute attorney satisfy the requirement. Another line of cases

could develop around who requested such representation: the accused's family, friends, or perhaps a criminal accomplice, or the attorney himself who has a reduced caseload. Would the police be required to inform the accused no matter who was seeking representation for the accused, even if such representation is sought out of the self-interest of the party seeking the representation?

An infinite number of circumstances could be, envisioned only to create a new extension of the exclusionary rule. The Supreme Court in *Burbine* found *Miranda* sufficient protection of the suspect's constitutional rights before interrogation and found no need to further extend the exclusionary rule. We believe *Burbine* to be a reasonable consideration of the limit to which *Miranda* will be extended and that the Wisconsin Constitution does not require greater protection. Since the right to counsel and the right to remain silent are given by the constitution to the defendant, he alone can exercise those rights. Neither his family nor his attorney are threatened with accusations, nor do they have the defendant's knowledge of the case, including the defendant's knowledge of his own guilt or innocence, nor are they subject to the pain of the defendant's possibly guilty conscience. Therefore, no one but the accused can make the decision to make a statement to the police or to ask for the assistance of counsel in making his decision. Since both the rights and the person the rights are granted to, the accused, are the same under both the federal and Wisconsin Constitutions, there is no logical reason to find that someone other than the accused could exercise those rights under the Wisconsin Constitution.

*Id.* at 211–13. To accept Justice Crooks' suggestion would be to overrule *Hanson* and the two decades of established Wisconsin precedent that have followed it. We decline to do so. Instead, we take this opportunity to

343

emphasize that *Hanson* is still good law in this state. Article I, Section 8 of the Wisconsin Constitution provides the same protections prior to charging a suspect as does the Fifth Amendment to the United States Constitution. *Id.*

d. third interview

¶ 56. We now address Ward's challenge to the admissibility of incriminating statements she made at the third interview on the morning of December 2. As was the case with respect to the second interview, Ward contends that her waiver of the right to counsel was not valid and her subsequent statements were inadmissible because she did not give them voluntarily. Her argument in this regard is based on the officers not permitting her to consult with her husband about whether to contact an attorney. As noted above, Ward also argues that the nature of her detention the previous night made her incriminating statements at the third interview involuntary. However, we note that it was Ward, not the officers, who initiated the third interview. In addition, the following dialogue demonstrates how Ward was once again given *Miranda* warnings, and once again waived her rights, prior to making any incriminating statements:

> [Schaepe]: Well I'll read these uh five statements to you again uh Jennifer. And if you don't understand any of 'em let me know. Uh if you say yes that you do understand I'll put a little checkmark in front of them. And then there's a Waiver of Rights below that and I'll have you just read it to yourself because uh I had already read that to you yesterday. And then uh I would ask if you're willing to talk to us just to sign it here. And uh then we'll ask ya a few questions and you can tell us what else you know.
>
> [Ward]: Oh question.

344

[Schaepe]: Uh huh (affirmative).

[Ward]: If I wasn't willing to talk to you why would we be in here?

[Schaepe]: That's [] a good point.

[Wood]: That is a good point.

[Schaepe]: Right. You're here because you wanted to talk to us. So let me just get through this and then we . . .

[Ward]: Okay.

[Schaepe]: . . . can discuss it.

[Ward]: You said any questions ask.

[Wood]: Yeah . . .

[Schaepe]: No.

[Wood]: . . . that's a good one.

[Schaepe]: Yeah. I you got me on that one.

[Wood]: *(Laughing).*

[Schaepe]: Number one. You do have the right to remain silent. Do you understand that?

[Ward]: Yes.

[Schaepe]: Okay. Number two. Anything you say can be used against you in a court of law. Do you understand that?

[Ward]: Yes.

[Schaepe]: Number three. You have the right to consult with a lawyer before questioning and to have a lawyer present with you during questioning. Do you understand that?

345

[Ward]: Yes. But I at the time was like okay I didn't know who to call.

[Schaepe]: Well and uh there's a phonebook with uh plenty of attorneys uh in the book. Uh Rhinelander has loads of 'em. So uh ya know if you want an attorney uh ya know you can look in the phonebook if you'd [] like or pick one out or if ya know one or what have you. But I will ask you this uh and tell you this that you do have the right to consult a lawyer before questioning and to have a lawyer present with you during questioning. Do you understand that?

[Ward]: Yes I do. And should I have?

[Schaepe]: Well that's a decision that that you can make. Um the Waiver of Rights we'll go over these again. If you understand these five statements that I read to you you can make that decision if you want to talk to us or not. I mean but it's entirely up to you. All we can do is explain what this [] is. Uh and then you make the decision of whether you wanna talk to us or not.

[Ward]: Well I do wanna talk to you.

[Schaepe]: Number four. If you cannot afford to hire a lawyer one would be appointed to represent you at public expense before any questioning if you so [] wish. Do you understand that?

[Ward]: Yes.

[Schaepe]: Okay. And then number five. If you decide to answer questions now without a lawyer present you have the right to stop the questioning and remain silent at any time you wish and the right to ask for and have a lawyer anytime you wish including during the questioning. Do you understand that?

[Ward]: Yes.

■■■■■■■■■■■■

■■■■■■

[Schaepe]: Okay.

[Ward]: Well this is why I wanted to call my husband yesterday to ask him what I should do.

[Schaepe]: Oh. You wanted his advice. Well um we're asking you now. I mean you're the one that's gonna have to make that decision at this point in time. Um so that's the Waiver um ya know here maybe you oughta hold it. You could read it better. This is the Waiver of Rights right here. If you wanna read that to yourself and then decide on whether you wanna talk to us. That's up to you.

. . . .

[Schaepe]: The only restrictions that you've had up until this point is calling out to make a personal phone call. Um if you want an attorney you can call an attorney and that's what it says there. At any time you can call an attorney. And that's why the jailer came to you yesterday as well and said that um you don't have any you can't have any personal phone calls out but you can have a phone call to your attorney if you'd like. That's what he told you last night too.

[Ward]: And I didn't have one. And I didn't know who to call. And usually they're gone by that time.

[Schaepe]: Okay. Well now we're here and it's ten o'clock ten thirty ten twenty-five in the morning. Um . . .

[Ward]: Actually what time is it?

[Schaepe]: Ten twenty-five.

[Ward]: Okay.

[Schaepe]: And there's uh attorneys in their offices at this time. So uh the question is do you wanna talk to us at this time without an attorney or not? That's uh that's up to you.

347

[Wood]: And that is ya know that's your personal decision Jennifer. I mean that's . . .

[Schaepe]: We cannot make that decision for you.

[Wood]: Yeah. I understood this morning that you wanted to talk to us to resolve something. Or at least that's what I thought you were contacting us for.

[Ward]: Yes.

[Wood]: Okay.

. . . .

[Wood]: And I think before we talk anymore you need to make a decision on that form. 'Cuz we really can't talk to you about things unless uh you make that decision.

[Ward]: Not even what we discussed yesterday?

[Wood]: Um um (negative).

[Ward]: Why is that? 'Cuz I already . . . excuse me.

[Wood]: It today's a different day though.

[Ward]: You have to do it for every day you talk to somebody?

[Wood]: Yeah. If you're in . . .

[Ward]: Oh. That's too much paperwork.

[Wood]: . . . if you're in custody. Well it is but I mean again it's an important issue.

[Schaepe]: The question is do you wanna waive those Rights that I had read to you and talk to us without an attorney present. That is your decision to make.

[Ward]: Yeah. Because what I'm saying to you is the truth anyway.

348

At this point Ward signed the waiver form and questioning began. Ward then made further statements implicating her in the death of her nephew.

¶ 57. We resolve whether Ward's waiver of rights at the third and final questioning session was knowing, voluntary and intelligent in much the same way we resolved the validity of her waiver at the second questioning session. Again, it is apparent that Ward's waiver "was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine,* 475 U.S. at 421. In fact, Ward's desire to waive her rights was so apparent that she stated, "If I wasn't willing to talk to you why would we be in here?" Furthermore, at this third session, the detectives repeatedly emphasized to Ward the importance of counsel, yet she did not invoke that right. Schaepe and Wood told her that attorneys' offices were open and that she could call one immediately. Ward elected not to do so. Ward apparently saw no need to call an attorney, because, as she stated, "what I'm saying to you is the truth anyway."

¶ 58. Now, Ward complains to us that her waiver was not valid because she wanted to talk to her husband in order to decide whether to invoke her right to counsel, and the detectives did not permit her to do so. Again, we emphasize that the decision whether to invoke the right to counsel is personal to the suspect, and cannot be made by anyone else. *Hanson,* 136 Wis. 2d at 213. The officers had no constitutional obligation to permit Ward to speak to her husband. Their only obligation was to permit Ward to speak to an attorney if she asked to do so. All she had to say was, "I

want a lawyer." Ward never did this. Instead, she again asked the detectives if they thought she should get an attorney, but under *Hanson,* that decision was Ward's alone, *id.,* and under *Jennings,* the detectives had no obligation to cease questioning or ask Ward to further clarify her remarks, *Jennings,* 252 Wis. 2d 228, ¶ 32. Accordingly, we conclude that Ward's waiver was knowing, voluntary and intelligent.

¶ 59. In addition, we conclude that Ward's statements made subsequent to her waiver of rights were obtained voluntarily and are admissible. In determining the voluntariness of Ward's statements, we note that the officers' refusal to permit Ward to speak with her husband was not coercive because it did not prevent her from speaking with "a free and unconstrained will, reflecting deliberateness of choice." *Davis,* 310 Wis. 2d 583, ¶ 36. Furthermore, any effect that Ward's brief deprivation of the right to counsel the previous night may have had on the voluntariness of her subsequent statements is negated by her initiating the interview, her obvious willingness to talk and her clear waiver of rights. As Ward stated at this very interview prior to incriminating herself, "If I wasn't willing to talk to you why would we be in here?" Accordingly, Ward's statements were voluntary.

3. Cumulative effect

¶ 60. Ward's final argument is that the totality of the circumstances test for the voluntariness of her statements contemplates that all three questioning sessions should be evaluated as a single event. She asserts that the combined effect of police conduct constituted coercion sufficient to render *all* of her statements involuntary.

¶ 61. We reject this argument. It appears that Ward is attempting to have the voluntariness of her statements at these questioning sessions evaluated without any consideration for the validity of her waiver of the rights to silence and to counsel. However, as the Supreme Court has noted, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Dickerson,* 530 U.S. at 444 (quoting *Berkemer,* 468 U.S. at 433 n.20). Accordingly, Ward's waiver of rights and her conversational demeanor during those waivers, where she completed the officer's statements with an accurate recitation of the right he was expressing, is part of the context in which we evaluate Ward's assertion that her subsequent incriminating statements were not voluntary. *See id.*

¶ 62. To hold otherwise would alter the principles courts have explained that guide police conduct to assure that a suspect's rights are respected. When the courts set out principles that explain constitutional rights, police are better able to understand what they can and cannot do when interrogating suspects. *Fare v. Michael C.,* 442 U.S. 707, 718 (1979) (noting that, in the context of questioning a juvenile, the current system of rigid specificity in regard to what is appropriate police conduct has the virtue of informing police what they may do in conducting custodial interrogation). These principles create a balance that protects the rights of individuals, while at the same time permitting the police to do their job.

¶ 63. We perceive no basis for Ward's contention that the sequence of permissible police actions that occurred here, when combined, renders her statements

inadmissible under the totality of the circumstances. We understand Ward's argument to be that the combination of circumstances to which she was subjected resulted in coerced statements, even if none of these circumstances were individually sufficient to result in coercion. *See People v. Washington,* 413 N.E.2d 170, 174 (Ill. App. Ct. 1980) (reviewing whether in a Sixth Amendment right to counsel context a "combination of circumstances, even if they would not be coercive if taken singly may, in combination, produce intolerable pressure").

¶ 64. Police coercion is a necessary predicate to a finding that a confession is not voluntary. *Hoppe,* 261 Wis. 2d 294, ¶ 37 (citing *Connelly,* 479 U.S. at 167); *see also Withrow v. Williams,* 507 U.S. 680, 708 (1993) (holding that police coercion is a "crucial element" to a determination of involuntariness). The only instances of potentially improper police conduct in this case were Schaepe's incomplete representation of Ward's daughter's description of Ward shaking the baby, and the brief deprivation of her right to contact an attorney during her night in jail, if she had requested to do so. We have concluded that those factors did not cause Ward to incriminate herself. *See supra* ¶¶ 26, 53–54. Throughout the interviews, all of the detectives' conduct either was expressly authorized by principles set forth by the United States Supreme Court in the waiver context, or did not constitute factors sufficient under the totality of the circumstances to undermine the voluntariness of Ward's incriminating statements. Therefore, while relevant, Schaepe's omission and Ward's brief deprivation of the right to counsel are "insufficient . . . to make [] otherwise voluntary confession[s] inadmissible." *Frazier,* 394 U.S. at 739. We do not

accept Ward's contention that the combination of police conduct rendered her waivers invalid or her statements involuntary.

¶ 65. Furthermore, Ward's assertion would detrimentally affect the waiver analysis in that her argument represents a dramatic step away from the clear principles established by the United States Supreme Court and a return to the type of fuzzy distinctions that have been rejected in the past because they made it all but impossible for the police to do their job and for suspects to understand their rights. *See, e.g.,* Charles D. Weisselberg, *Saving Miranda,* 84 Cornell L. Rev. 109, 113, 123–26 (1998) (noting that pre-*Miranda* standards were impossible to apply due to the nearly infinite variety of circumstances in which interrogation might take place, and bright-line rules, which would make the job of the police manageable, while effectively informing suspects of their rights, were necessary); Stephen J. Schulhofer, *Confessions and the Court,* 79 Mich. L. Rev. 865, 869–72 (1981) (criticizing the pre-*Miranda* standard for confessions, noting its complete failure to provide either protection to suspects or guidance to the courts and the police).

¶ 66. We note that the police generally have been successful operating under the system of principles pertaining to waiver of rights that were put in place by *Miranda, Edwards* and *Burbine.* The Fifth Amendment rights to remain silent and to have counsel provided are now firmly rooted in the public consciousness. Furthermore, as has been recognized,

> [t]he years after *Miranda* have not diminished the need for bright-line rules. Abandoning the original vision of *Miranda* leaves courts and police to struggle with case-by-case determinations of voluntariness. In contrast, by complying with *Miranda,* officers largely avert

the need for a voluntariness inquiry. In the overwhelming majority of cases, a court will find that a suspect who received proper warnings and waived his or her Fifth Amendment rights made a voluntary statement. Furthermore, apart from the notion that a fully informed waiver usually negates a claim of coercion, *Miranda* has made it easier to resolve a motion to suppress a statement under the Fourteenth Amendment. Because courts typically view an officer's violation of *Miranda* as a significant indicator of a coerced statement under the totality of the circumstances analysis, complying with *Miranda* bolsters a prosecutor's position under the Fourteenth Amendment.

Weisselberg, *Saving Miranda,* 84 Cornell L. Rev. at 166. To argue for a return to the situation that existed prior to the promulgation of these clear principles, essentially the result of accepting Ward's approach, would be to argue for a return to a scheme which provides no real guidance.

¶ 67. Because the police conduct in this case was lawful, we cannot conclude that putting it all together results in Ward's waiver of rights being invalid or her subsequent statements being coerced. Accordingly, we affirm the decision of the court of appeals, which affirmed the circuit court's judgment convicting Ward of first-degree reckless homicide.

## III. CONCLUSION

¶ 68. The dispositive issue in this case is whether incriminating statements Ward made during the police investigation subsequent to the death of her seven-week old nephew were not voluntarily made and should have been suppressed. We conclude that once in police custody, Ward knowingly, voluntarily and intelligently waived her Fifth Amendment rights to silence and to

counsel and that under the totality of the circumstances, her statements were voluntarily made because neither her personal characteristics nor police conduct resulted in coerced statements. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 69. N. PATRICK CROOKS, J. *(dissenting)*. As a Justice on this court, but also as a father and a grandfather, I abhor the abuse of the baby, Thomas, that resulted in his death. While I am repulsed by the mistreatment of this baby and of any child, I write to caution the great majority of excellent Wisconsin law enforcement officers that they should not emulate the interrogation tactics that were used in this matter. Such tactics resulted in statements here that should not have been found reliable and trustworthy and should instead have been suppressed under the totality of the circumstances test. Even when medical evidence of an earlier brain injury and internal bleeding suffered by this baby was brought to the attention of law enforcement, it appears that such evidence was ignored, and the focus remained on just one suspect, Jennifer Ward, to the exclusion of any other person who could have caused the injuries that were ultimately fatal.

¶ 70. I agree wholeheartedly with the majority's observation that "[w]hen the courts set out principles that explain constitutional rights, police are better able to understand what they can and cannot do when interrogating suspects." Majority op., ¶ 62. That is precisely why I dissent in this case. The majority is content to give the court's stamp of approval to the tactics used here, but it should not be oblivious to the message this ruling will send.

¶ 71. I find that message very disturbing in light of much case law from this court, from the courts of numerous other states, and from the United States Supreme Court, discussing the very real dangers of incommunicado questioning,[1] a method of investigation which impinges on both rights at issue here: the right to have only voluntarily made statements entered in evidence and the right to counsel. A primary concern of mine is for the reliability and trustworthiness of the statements that I fear, as a result of the majority's opinion, will be used as evidence in the future.

¶ 72. In finding that statements by Ward were voluntary, the majority focuses on technicalities—such as that Ward was told in the nighttime hours that the strict prohibition placed on phone calls by her did not preclude a call to an attorney—and understates by at least 23 hours the amount of time Ward was held incommunicado,[2] a key factor in the totality of the circumstances.

¶ 73. For the reasons given below, I therefore respectfully dissent.

---

[1] The word *incommunicado* is defined in Black's Law Dictionary as "[w]ithout any means of communication" and "([o]f a prisoner) having the right to communicate only with a few designated people." *Black's Law Dictionary* 780 (8th ed. 2004). It is defined in the American Heritage Dictionary as meaning "[w]ithout the means or right of communicating with others . . . ." *American Heritage Dictionary* 914 (3d ed. 1992).

[2] Majority op., ¶ 53 (citing cases on incommunicado interrogations and characterizing the period of time Ward was incommunicado as "[an] hour and 40 minutes"—apparently counting the time between approximately 5:20 p.m., when Ward was made to understand that she could not make any phone calls, and approximately 7 p.m., when Detective Glenn Schaepe told a jailer to inform her that the restriction on phone calls did not apply to a call to an attorney).

356

# I

A. The voluntariness of the statements

¶ 74. A determination of a statement's voluntariness is made based on the totality of the circumstances, "balancing . . . the personal characteristics of the defendant against the pressures imposed upon the defendant by law enforcement officers." *State v. Hoppe,* 2003 WI 43, ¶ 38, 261 Wis. 2d 294, 661 N.W. 2d 407.

¶ 75. While I agree that Ward's characteristics tend to weigh in favor of a finding of voluntariness, the tactics of the police should give us all pause. The statements at issue here were obtained through a troubling mix of deceptive and manipulative methods, employed on a suspect who was at every turn blocked from contact with anyone, including a lawyer and family members who were present and waiting just outside a door. This methodical isolation began at the hospital before Ward was even in custody and continued throughout the remainder of a day, a night, and the next morning, for a total of more than 24 hours until the third interrogation produced the statements the police were seeking.

¶ 76. The first questioning of Ward began at approximately 9:30 a.m. in her hospital room. It would be well into the next day before she spoke to anyone besides her interrogators or the jailer. When Detective Glenn Schaepe (Schaepe) arrived at the hospital, he sent Ward's daughter out of the room. He later turned away a friend of Ward who asked to speak to her in the hospital room. He turned Ward's husband away. He turned her attorney away on one occasion and ignored him when he made a second attempt to see Ward at the jail.

¶ 77. The United States Supreme Court has acknowledged that holding a suspect incommunicado is problematic. When the Court addressed a situation in

which the suspect in police custody had been told that he could not make a call to his wife until he had signed a confession, the Court noted, "We cannot blind ourselves to what experience unmistakably teaches: that even apart from the express threat, the basic techniques present here—the secret and incommunicado detention and interrogation—are devices adapted and used to extort confessions from suspects." *Haynes v. Washington*, 373 U.S. 503, 514 (1963).

¶ 78. Haynes "gave in only after consistent denials of his requests to call his wife, and the conditioning of such outside contact upon his accession to police demands." *Id.* Similarly, it was only at the beginning of the third interrogation session, on the second day, that Ward had the first indication from Schaepe that she could contact her husband. The first words out of her mouth were, "[Can I] make a phone call and talk to my husband?" Schaepe's response: "Yeah. Yeah. As soon as we're done here." An hour later, at the end of the interrogation, she asked again, "The call thing[—] are you gonna [—?]" He then responded, "Yeah. That's lifted." It was then 11:17 a.m., almost 26 hours after Schaepe had begun the initial questioning of Ward. She had been held incommunicado until that point in time.

¶ 79. In *Darwin v. Connecticut*, 391 U.S. 346 (1968), the United States Supreme Court again addressed the tactic of holding a suspect without contact until a confession is extracted:

> The inference is inescapable that the officers kept petitioner incommunicado for the 30 to 48 hours during which they sought and finally obtained his confession. Considering the "totality of the circumstances[,]" we conclude that the court erred in holding that the confession and the partial re-enactment were voluntary. The denial of access to counsel and the outside

world continued throughout, and there was "no break in the stream of events" from arrest throughout the concededly invalid confessions of [the first day] to the confession and re-enactment of [the second day] "sufficient to insulate" the final events "from the effect of all that went before."

*Id.* at 349 (citations omitted).

¶ 80. In dissent in *Moran v. Burbine,* Justice Stevens decried the majority's willingness to accept the incommunicado questioning of a suspect in the service of obtaining a confession where the police failed to notify the suspect of the presence of an attorney retained on his behalf:

> The core of the Court's holding is that police interference with an attorney's access to her client during that period is not unconstitutional. The Court reasons that a State has a compelling interest, not simply in custodial interrogation, but in lawyer-free, incommunicado custodial interrogation. Such incommunicado interrogation is so important that a lawyer may be given false information that prevents her presence and representation; it is so important that police may refuse to inform a suspect of his attorney's communications and immediate availability. This conclusion flies in the face of this Court's repeated expressions of deep concern about incommunicado questioning. Until today, incommunicado questioning has been viewed with the strictest scrutiny by this Court; today, incommunicado questioning is embraced as a societal goal of the highest order that justifies police deception of the shabbiest kind.

*Moran v. Burbine,* 475 U.S. 412, 437–439 (1986) (Stevens, J. dissenting).

¶ 81. Our court has had occasion to discuss similar police tactics as well. In *Phillips v. State,* 29 Wis. 2d 521, 139 N.W.2d 41 (1966), we addressed, among other

things, the propriety of holding a suspect incommunicado from 4:45 p.m. one day until the next morning. While the court's strong language was made in the context of a discussion of how long a person could be detained before being brought before a magistrate, the opinion made some trenchant observations about the discretion of police to hold suspects incommunicado:

> The usual investigatory methods of the police lend themselves to the search for a confession and we point out again as we did in *Pulaski v. State* (1964), 23 Wis. (2d) 138, 126 N.W. (2d) 625, that long detentions are looked upon with disfavor by this court and *seriously impair the voluntariness of the confession* from the standpoint of psychological aspect of the usual police-station hazards. We find no justification in holding a person under investigation incommunicado no matter for what length of time. Such device smacks of the star chamber and *is an indication in itself of overbearing on the part of the police.* Delaying of a request of an accused to talk to his family or friends or his attorney should be considered *strong evidence of overbearing pressure to obtain a confession or inculpatory statements.*

*Id.* at 535–536 (emphasis added).

¶ 82. The pattern of coercion undoubtedly began at the hospital. For example, it is clear that Schaepe had already decided that Ward would be going to the Sheriff's Department for further questioning even before he asked her whether she would be willing to do so. Near the end of the interview, when only the two of them were in the room, Schaepe stated that Ward had not admitted what "specifically occurred":

> [Y]ou don't want to take responsibility for what happened. You're talking you know general in general terms you are that you were the caretaker, but as far as

360

what [] specifically occurred, I don't think you want to
get into that. And that's why I believe you're having a
hard time remembering things and you're having []
pain in your head. I'll make one more phone call here.
And then maybe *we can get on our way.* . . . (Emphasis
added.)

¶ 83. Only later did Schaepe tell Ward that he
would like to "go over to the Sheriff's Department" and
that someone "can give [Ward] a ride over to the
Sheriff's Department" because he knew she "didn't have
a ride now." He knew that because he had sent away the
person who had come to drive her home. While I note
that no party specifically identifies at what point Ward
was taken into custody, the State concedes that Ward
was in custody by the second interrogation. Majority
op., ¶ 12. Ward made no inculpatory statements while
in the hospital room. The statements Ward made in
that interrogation were consistent: she repeatedly
said that she had not shaken the baby. (Even when
Schaepe falsely stated that Ward's daughter had told
police "that the child was crying hard and she saw you
shake the baby," Ward responded, "I don't remember
shaking him though."[3]) While the pattern that would

---

[3] The majority wrongly characterizes Schaepe's statement
as true but incomplete. Majority op., ¶ 27. Schaepe's statement
is absolutely false. The child was unresponsive, not "crying
hard," at the time that Ward's daughter saw her trying to revive
him. As the majority points out, "use of deceit . . . does not by
itself make an otherwise voluntary confession inadmissible." *Id.*
(quoting *State v. Fehrenbach,* 118 Wis. 2d 65, 66–67, 347 N.W.2d
379 (Ct. App. 1984). There is no need, therefore, for the
majority to assert the truth of a statement that was in no
respect true. In any event, as the majority concedes, deceit
remains a significant factor that is entirely appropriate to
consider in an analysis of the totality of the circumstances.

continue throughout the next day did begin there, nothing that Schaepe did at the hospital, standing alone, rose to the level of coercion that would render those statements involuntary.

¶ 84. I am satisfied under the totality of the circumstances that the tactics used here, including holding Ward incommunicado and using deceit, rendered the statements given by Ward in the two subsequent interrogations and the many reenactments involuntary; such statements thus should have been suppressed.[4]

Majority op., ¶¶ 27, 28. In a recent United States Supreme Court case, the significance of such deceit was highlighted. *Montejo v. Louisiana,* 556 U.S. ___ (2009) (remanding for a determination of whether a waiver was knowing and voluntary and noting that the determination may turn on the factor of misrepresentations made by police). There the deceit potentially affects the valid waiver of counsel; here it affects the voluntariness of the statements obtained from Ward.

[4] I note in addition that the admission of the statements was not harmless beyond a reasonable doubt. The prosecution relied heavily on Ward's statements in the State's case and buttressed that evidence with testimony from medical experts. This is especially troubling in this type of case. Medical evidence in so-called "shaken baby" cases is very much in dispute at the moment, and the risk of wrongful convictions based on powerful but ultimately discredited expert testimony is significant. Given the evidence of prior brain injury, it is relevant, but not dispositive, that Ward was the person who was with the baby when he died. Majority op., ¶ 43 n.5. Scientific understanding of these tragic injuries is rapidly advancing, and in a similar case our court of appeals noted that "a significant and legitimate debate in the medical community has developed in the past ten years over whether infants can be fatally injured through shaking alone, whether an infant may suffer head trauma and yet experience a significant lucid interval prior to death, and whether other causes may mimic the symptoms traditionally viewed as indicating shaken baby or shaken impact syndrome."

## B. Waiver of the right to counsel

¶ 85. In finding that the waiver of counsel was valid, the majority accepts the surprisingly low standard set by the United State Supreme Court in *Burbine.* Courts in at least thirteen states have made clear that they will not accept *Burbine's* standard and will not tolerate actions like those that occurred in this case. The fact that Ward did not know (because police refused to tell her) that her attorney came to the building where she was being interrogated on two separate occasions and asked to speak to her is indeed significant. Such jurisdictions have rightly concluded that a waiver of

*State v. Edmunds,* 2008 WI App 33, ¶ 15, 308 Wis. 2d 374, 746 N.W.2d 590, *review denied,* 2008 WI 40, 308 Wis. 2d 609, 612, 749 N.W.2d 661 (unpublished table decision). In Texas, the court of appeals recently granted a stay of execution in a similar case, where the defendant had consistently explained the child's injuries as resulting from being accidentally dropped onto a concrete floor. The court explained:

> At the time of trial Dr. Roberto Bayardo, the highly experienced medical examiner for Travis County, testified that it was "impossible" for Brandon's extensive brain injuries to have occurred in the way that applicant stated. He testified that her story was false and "incredible." In his opinion (and that of Dr. Sparks Veasay of Lubbock County), Brandon's injuries had to have resulted from a blow intentionally struck by applicant. He concluded, "I would say the baby was caught up with the hands by the arms along the body and then swung and slammed very hard against a flat surface." In his 1995 opinion, Brandon was an abused baby whom applicant had intentionally murdered.
>
> But according to the affidavits and/or reports submitted by Drs. John J. Plunkett, Peter J. Stephens, Janice J. Ophoven, and Kenneth L. Monson, recent advances in the area of biomechanics and physics suggest that it is perhaps possible that Brandon's head injuries could have been caused by an accidental short-distance fall.

*Ex parte Henderson,* 246 S.W.3d 690, 691 (Tex. Crim. App. 2007).

counsel made under such circumstances cannot be "knowing" when police conduct keeps the accused from knowing that counsel is present and available. Those jurisdictions have therefore ruled any waiver of counsel invalid where police engage in that kind of conduct, generally on the grounds that such conduct by police violates the state's constitutional guarantees of due process. We should do the same.

¶ 86. In finding that the waiver of counsel was valid, the majority also utilizes what amounts to a legal technicality, the strained and artificial distinctions in Fifth and Sixth Amendment jurisprudence. Under that jurisprudence, the analysis of a waiver's validity often turns on the rather arbitrary question of when charges were filed. It appears, given the fact that the same law enforcement officer who was involved in *State v. Hornung,* 229 Wis. 2d 469, 600 N.W.2d 264 (Ct. App. 1999), conducted the investigation here, that the lesson of *Hornung* has not been lost on some police officers. In this case, there was a conspicuous delay in filing charges until after multiple interrogations and reenactments, and the police thus succeeded in avoiding any danger that Ward would be eligible for the greater protections of the Sixth Amendment. But this case clearly illustrates the plain unfairness of the legal line-drawing between Fifth and Sixth Amendment constitutional protections and the legal artifices that control which Amendment is technically in play at a given point. We should do as other jurisdictions have done and, under our state constitution, treat a waiver of the right to counsel the same regardless of whether it occurs before or after charges are filed.

¶ 87. Ward's waiver of her right to counsel should therefore be found invalid for two reasons. First, it was not knowing and voluntary because police refused on

two occasions to inform her that her attorney was present in the building where she was being interrogated and was available to assist her. We should follow the lead of the many states that have established that under such conditions, a waiver of counsel cannot be knowing and is thus invalid. Second, Ward's statements to the police about wanting to talk with her husband about getting an attorney should be considered a sufficient invocation of her right to counsel, and we should follow the lead of the jurisdictions that have, relying on state constitutions, erased the arbitrary lines drawn by the United States Supreme Court as to how the timing of the filing of charges against a defendant determines what is sufficient to invoke the right to counsel under the Fifth and Sixth Amendments.

¶ 88. The United States Supreme Court's decision in *Burbine*—affirming the validity of a waiver notwithstanding the failure of police to notify the defendant of the presence nearby of an attorney retained on his behalf—undoubtedly cleared the way for the sort of holding we have from the majority in this case, but the case included some notable reservations. In *Burbine,* the Supreme Court acknowledged that the floor it was setting for compliance with the Fifth Amendment was below what certain states were willing to countenance: "We acknowledge that a number of state courts have reached a contrary conclusion." *Burbine,* 475 U.S. at 427. That has certainly continued to be the case. The Court also recognized that its rule was inconsistent with the American Bar Association Standards of Criminal Justice. *Id.* The Court paid little attention to what it conceded was "the numerical preponderance of lower court decisions" that would have held otherwise. *Id.*

365

¶ 89. Indeed, at least thirteen states[5] have asserted their unwillingness to set the bar as low as *Burbine* does, to "permit police to delude custodial suspects, exposed to interrogation, into falsely believing they are without immediately available legal counsel and to also prevent that counsel from accessing and assisting their clients during the interrogation." *People v. McCauley,* 645 N.E.2d 923, 929 (Ill. 1994) (noting that "[t]he incommunicado interrogation and surrounding coercive environment likely to result from this objectionable practice is exactly the sort of scenario previously condemned by the United States Supreme Court in *Escobedo*[6] and *Miranda*[7]"). As the New Jersey Supreme Court stated, the common thread among state courts' rejection of *Burbine* is "one supervening principle: the atmosphere of custodial interrogation is inherently coercive . . . ." *State v. Reed,* 627 A.2d 630, 640 (N.J. 1993). That court got to the heart of the matter when it stated, "[O]ur decision today should be governed by a two-fold purpose: to enhance the reliability of confessions by reducing the inherent coercion of

---

[5] *See State v. Stoddard,* 537 A.2d 446, 452 (Conn. 1988); *Bryan v. State,* 571 A.2d 170, 175 (Del. 1990); *Haliburton v. State,* 514 So.2d 1088, 1090 (Fla. 1987); *People v. McCauley,* 645 N.E.2d 923, 929 (Ill. 1994); *Malinski v. State,* 794 N.E.2d 1071, 1079 (Ind. 2003); *West v. Commonwealth,* 887 S.W.2d 338, 342 (Ky. 1994); *Commonwealth v. Mavredakis,* 725 N.E.2d 169, 178 (Mass. 2000); *People v. Bender,* 551 N.W.2d 71, 72 (Mich. 1996); *State v. Lefthand,* 488 N.W.2d 799, 801–802 (Minn. 1992); *State v. Roache,* 803 A.2d 572, 578 (N.H. 2002); *State v. Reed,* 627 A.2d 630, 643 (N.J. 1993); *Dennis v. State,* 990 P.2d 277, 286 (Okla. Crim. App. 1999); *State v. Isom,* 761 P.2d 524, 527 (Or. 1988).

[6] *Escobedo v. Illinois,* 378 U.S. 478 (1964).

[7] *Miranda v. Arizona,* 384 U.S. 436 (1966).

custodial interrogation and diminish the likelihood of unreasonable police conduct in those situations where police, knowing that an attorney has been retained for the suspect and is asking for contact with his or her client, are desperate to acquire a confession before the suspect speaks with the attorney." *Id.* at 642.

¶ 90. The majority's holding that Ward's statements were insufficient to invoke her Fifth Amendment right to counsel and that her waiver of that right is thus valid depends on the fact that the waivers being challenged occurred prior to the time Ward was charged.[8] However, the timing of the filing of charges is something that is usually within the power of the law enforcement personnel who are conducting the investigation; through their manipulation of the chain of events, they can, as they did here, keep a suspect incommunicado for almost 26 hours, delay filing charges, and delay the time that the Sixth Amendment right to counsel attaches. I find it troubling that such manipulation can be dispositive of the validity of a waiver of the right to counsel under Fifth and Sixth Amendment jurisprudence.

¶ 91. In *Hornung,* the court of appeals found that the defendant's Sixth Amendment right to counsel had been violated when officers failed to permit the defendant to make telephone calls when he asked to do so. As noted above, the police detective involved in the present

---

[8] In overruling *Michigan v. Jackson,* 475 U.S. 625 (1986), a case prohibiting police from initiating interrogation of a defendant once he or she has requested an attorney at an arraignment or similar criminal proceeding, the United States Supreme Court recently decided that a waiver of right to counsel under the Sixth Amendment is not presumed invalid when police initiate interrogation. *Montejo,* 556 U.S. ___. *Montejo* does not apply directly to the issues now before this court.

case was the same person who conducted some of the interrogation there, and, interestingly, the same attorney, Jeff Jackomino, waited at the Sheriff's Department, requesting to speak to the person being questioned. *Hornung,* 229 Wis. 2d at 474.

¶ 92. The court of appeals noted that, in contrast to requirements under a Fifth Amendment analysis, "[a]ny language requiring an 'unequivocal or unambiguous' request for counsel . . . is conspicuously absent from the *Patterson* Court's discussion of the petitioner's Sixth Amendment right to counsel." *Id.* at 478 (citing *Patterson v. Illinois,* 487 U.S. 285 (1988)). It therefore noted, "As Hornung's Sixth Amendment right to counsel was effectively triggered by its attachment and subsequent assertion, any subsequent inculpatory statements or fruits therefrom must be suppressed as violative of Hornung's constitutional rights." *Hornung,* 229 Wis. 2d at 480.

¶ 93. In the *Hornung* case, the interrogation occurred after a criminal complaint and warrant were filed against Hornung, and Hornung's rights under the Sixth Amendment were at issue. Here the interrogation of Ward occurred before the filing of criminal charges, and thus, because case law establishes that the right to counsel under the Sixth Amendment does not attach until charges are filed, it is Ward's protections under the Fifth Amendment that are at issue.

¶ 94. Under the applicable case law, an "unequivocal and unambiguous" request for counsel seems to be required to comply with the Fifth Amendment prior to the filing of charges; the requirement for such a clear invocation appears considerably less stringent under the Sixth Amendment. *Id.* at 476–480. *See Patterson,* 487 U.S at 296 n.9 ("This does not mean, of course, that all Sixth Amendment challenges to the conduct of

postindictment questioning will fail whenever the challenged practice would pass constitutional muster under *Miranda*. For example, we have permitted a *Miranda* waiver to stand where a suspect was not told that his lawyer was trying to reach him during questioning; in the Sixth Amendment context, *this waiver would not be valid*." (emphasis added)).

¶ 95. In this case, Ward's repeated references in the interrogations to her wish to speak to her husband about retaining an attorney and her clear statements that it was unrealistic to expect her to be able to reach an attorney during nighttime hours would be viewed quite differently had she already been charged and had the Sixth Amendment right to counsel attached.[9]

¶ 96. Even if the circumstances presented here can be squared with the constitutional case law on waiver of right to counsel, it is worth considering bringing coherence to the odd patchwork of case law governing this area. To do so, we should turn, as many states have done, to our own constitution.

¶ 97. Courts in many states, including Alaska, Hawaii, Minnesota, New Jersey, New York, and Pennsylvania, have invoked their own state constitutions to create clearer and fairer rules about the conditions under which the right to counsel attaches[10] and to

---

[9] It may well be of some significance in a Sixth Amendment analysis that, as to statements made in the third interrogation, Ward initiated contact with the officers, given the language in *Hornung:* "As noted, once the Sixth Amendment has attached and been asserted, any subsequent waiver of the right to counsel is invalid, unless contact is initiated by the defendant." *State v. Hornung,* 229 Wis. 2d 469, 480, 600 N.W.2d 264 (Ct. App. 1999).

[10] *See, e.g., Blue v. State,* 558 P.2d 636 (Alaska 1977) (holding that right to counsel applies at pre-indictment lineup);

provide a more robust right to counsel than the United States Supreme Court has found in the Fifth and Sixth Amendments.[11] As the Supreme Court of Minnesota said:

> We acknowledge that this rule provides more protection than is required by the United States Constitution. We do not cavalierly interpret our state constitution more expansively than the United States Supreme Court has interpreted the federal Constitution. However, the rule we . . . reaffirm here[] is consistent with our "long tradition of the assuring the right to counsel."

*State v. Liulama,* 845 P.2d 1194, 1200 (Haw. Ct. App. 1992) *cert. denied,* Feb. 22, 1993, (holding waiver invalid and any post-arrest statements by a defendant to the police inadmissible absent prior advice from a court or defendant's own counsel of his right to counsel); *State v. Risk,* 598 N.W.2d 642, 647 (Minn. 1999) (requiring police to cease questioning an accused who makes an ambiguous or equivocal statement invoking the right to counsel and noting that the holding "provides more protection than is required by the United States Constitution"); *Commonwealth v. Richman,* 320 A.2d 351, 353 (Pa. 1974) (holding that the right to counsel attaches at arrest).

[11] In addition to states rejecting *Moran v. Burbine,* 475 U.S. 412 (1986), on state law grounds (*see supra,* ¶ 89 n.5), see, e.g., *Alexander v. City of Anchorage,* 490 P.2d 910, 914–15 (Alaska 1971) (extending types of cases to which right to counsel is applicable); *State v. Sanchez,* 609 A.2d 400, 407 (N.J. 1992) (establishing higher standard for the state to show valid waiver of right to counsel and noting that the state constitution affords "greater protection of the right to counsel than is provided under the federal Constitution"); *People v. West,* 81 N.Y.2d 370, 375 (N.Y. 1993) (imposing on police the burden of determining whether representation by counsel continued where a suspect was interviewed a second time after three years had elapsed and noting that "[t]he State right to counsel is a cherished principle, rooted in this State's prerevolutionary constitutional law and developed independent of its Federal counterpart").

*State v. Risk,* 598 N.W.2d 642, 649 (Minn. 1999) (citations omitted).

¶ 98. Similarly, in *State v. Liulama,* the Intermediate Court of Appeals of Hawaii stated:

> Logic and sound regard for the purposes of article I, section 14, as exemplified by case law and the HRPP, favor the extension of the protection of article I, section 14, beyond that of the sixth amendment as expressed in *Patterson.* We do not believe that the pragmatic approach expressed by the Patterson court is in keeping with the importance attached by the Hawaii Supreme Court to the right to counsel under article I, section 14, as indicated above.
>
> Accordingly, we hold that where an accused has been arrested and interrogated by the police and has not been specifically advised by a court or by his own counsel that he has the constitutional right to counsel at every stage of the proceeding following that arrest, he cannot be held to have knowingly and intelligently waived that right, and any statements made by him to the police absent such advice are inadmissible.

*State v. Liulama,* 845 P.2d 1194, 1203 (Haw. Ct. App. 1992), *cert. denied,* Feb. 22, 1993.

¶ 99. Previously, we have adopted higher standards of conduct for law enforcement personnel of the State of Wisconsin. We have stated before that this court "will not be bound by the minimums which are imposed by the Supreme Court of the United States if it is the judgment of this court that the Constitution of Wisconsin and the laws of this state require that greater protection of citizens' liberties ought to be afforded." *State v. Knapp,* 2005 WI 127, ¶ 59, 285 Wis. 2d 86, 700 N.W.2d 899 (quoting *State v. Doe,* 78 Wis. 2d 161, 172, 254 N.W.2d 210 (1977)). This court should apply Article I, Section 8 of the Wisconsin

Constitution,[12] a provision that parallels the Fifth and Sixth Amendments of the United States Constitution, to cases like this one rather than continue to allow artificial distinctions to be drawn based on something as subject to manipulation as whether charges have been filed. I disagree with the majority's view that, unlike the approach we took in *Knapp* and *Dubose,* Article I, Section 8 should be interpreted here consistent with the United States Supreme Court's interpretation of the Fifth Amendment. Majority op., ¶ 18 n.3.

## II

¶ 100. In summary, my great concern here is protecting the search for the truth that is supposed to be the point of a trial. This court should hold, under the totality of the circumstances, that the tactics used, including holding Ward incommunicado for almost 26 hours and using deceit, resulted in involuntary statements that should have been suppressed. After all, a large part of the reason for banning involuntary confessions is that they are unreliable. *Jackson v. Denno,* 378 U.S. 368, 385–86 (1964). While a confession extracted over the course of three interrogations of a suspect whose family members and counsel were fended off over the course of two days may technically resolve a case, such tactics—sure to be used, I fear, now that this court has given its blessing—

---

[12] "[O]n occasion, we have interpreted a provision in the Wisconsin Constitution more broadly than the United States Supreme Court has interpreted a parallel provision in the United States Constitution. *State v. Knapp,* 2005 WI 127, ¶ 56, 285 Wis. 2d 86, 700 N.W.2d 899 (interpreting Article I, § 8 more broadly than the United States Supreme Court has interpreted the Fifth Amendment); *State v. Dubose,* 2005 WI 126, ¶ 45, 285 Wis. 2d 143, 699 N.W.2d 582 (also interpreting Article I, § 8 of the Wisconsin Constitution more broadly than the Fifth Amendment)." *State v. Arias,* 2008 WI 84, ¶ 19, 311 Wis. 2d 358, 752 N.W.2d 748.

leave lingering questions as to whether the right person was prosecuted and whether justice was served.

¶ 101. Further, we should follow the lead of other states and utilize Article I, Section 8[13] of our constitution to eliminate the artificial distinctions that exist between Fifth and Sixth Amendment jurisprudence, and we should utilize Article I, Section 7[14] of our constitution to find that a waiver of the right to counsel cannot be knowing, and therefore valid, where police have refused to inform an accused person that counsel is present and available.[15] On the facts of this case, we should therefore find Ward's waiver of her right to counsel invalid.

[13] Article I, Section 8 of the Wisconsin Constitution states in relevant part, "No person may be held to answer for a criminal offense without due process of law . . . nor may be compelled in any criminal case to be a witness against himself or herself."

[14] Article 1, Section 7 of the Wisconsin Constitution states in relevant part, "In all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel . . . ."

[15] Justice Shirley Abrahamson, now Chief Justice, in her dissent in *State v. Hansen,* 136 Wis. 2d 195, 401 N.W.2d 771 (1987), supported the position I take today. Writing about *Burbine,* she noted:

> By not imposing a federal constitutional requirement on the states and by encouraging the states to adopt their own rules governing police conduct, the United States Supreme Court recognizes the importance of the state courts in protecting individual rights and societal interests in our federal system.

> The majority struggles to show that the police conduct in this case fits within the letter of the law which entitles an accused to be represented during police questioning. But it is clear that the police conduct violates the spirit of the law. It is with good reason that the Wisconsin Constitution exhorts us that "the blessings of a free government can only be maintained by a firm adherence to justice . . . and by frequent recurrence to fundamental principles." Art. I, sec. 22.

¶ 102. For the reasons stated, I respectfully dissent.

¶ 103. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissent.

---

While I am aware of and give due weight to the needs of law enforcement officers and the weighty social objectives of crime investigation, I conclude that this court demeans the defendant's statutory and constitutional rights to consult with an attorney by giving its seal of approval to conduct that kept an accused from seeing a lawyer his family retained for him.

*Hansen,* 136 Wis. 2d at 220–221 (Abrahamson, J. dissenting) (citations omitted).