REILLY, P.J. (dissenting).
¶24 The issue before us is whether the "interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect [ (in this case John S. Finley) ], are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." Miller v. Fenton , 474 U.S. 104, 109 (1985). If a civilized system of justice wishes to maintain the respect and trust of its citizens, it cannot condone or sanction the use of lies, deception, and fabrication of evidence by police (or any other government agent) as a method of communicating with its citizens. Unfortunately, we, the judiciary, have authorized the government to lie, cheat, threaten, and fabricate evidence during interviews (noncustodial) and interrogations (custodial) as a proper "tactic" of the government. Majority, ¶22.
¶25 The district attorney asked the lead officer at the suppression hearing whether he agreed that police can lie to a person during an interview, and the officer replied "correct." The Majority supports the government's "interview,"[1] which utilized lies, threats, and fabrication of evidence to wrestle a statement from a thirty-six-year-old man, who has the mind of a twelve year old and the social skills of a first grader. The officers chose an "interview" rather than an "interrogation" expressly for the purpose of denying Finley his Miranda[2] warnings and a lawyer, both of which the officer testified would be an "impediment" to a confession.
¶26 If we are going to sanction the use of lies, deceit, and fabrication of evidence, it should be limited to custodial situations in which Miranda warnings have been given.[3] Under our current view, there appears to be no constitutional restraint that prevents any government agent-police officer, IRS agent, building inspector-from lying or cheating in the performance of their duty. A judicial system that utilizes lies, deceit, or fabricates evidence in a noncustodial encounter where Miranda warnings have not been provided does not comport with a civilized system of justice.
Voluntariness
¶27 The challenge Finley raises in this appeal is that the techniques used against him were unduly coercive resulting in an involuntary/false confession. Under the due process clause, "voluntariness"[4] is a legal question; "the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to this suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." Miller , 474 U.S. at 116.
¶28 When considering the totality of the circumstances, we must "balanc[e] the characteristics of the suspect against the type of police tactics that were employed to obtain the suspect's statement." State v. Ward , 2009 WI 60, ¶19, 318 Wis. 2d 301, 767 N.W.2d 236. Personal characteristics include "the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement." State v. Hoppe , 2003 WI 43, ¶39, 261 Wis. 2d 294, 661 N.W.2d 407. Importantly, when "allegedly coercive police conduct includes subtle forms of psychological persuasion," such as the Reid technique, "the mental condition of the defendant becomes a more significant factor in the 'voluntariness' calculus." Id. , ¶40 (citing Colorado v. Connelly , 479 U.S. 157, 164 (1986) ). In order to find involuntariness, we must find "some coercive or improper police conduct," but that conduct need not "be egregious or outrageous" to be coercive "if the defendant's condition renders him or her uncommonly susceptible to police pressures." Hoppe , 261 Wis. 2d 294, ¶46.
Interview of Finley
¶29 Applying the law to the facts of the case, the Majority fails to fully address the techniques utilized by Valadez and Vander Steeg in their interview of Finley. From the suppression hearing, we know that Valadez was the lead investigator and that he attended the interview of nine-year-old C.P. at the Child Advocacy Center. C.P.'s mother advised Valadez that C.P. has autism and ADHD and that C.P. is affectionate and likes to hug people. C.P.'s mother also informed Valadez that her brother, Finley, "has the mental capacity of a twelve year old" and "socially functions at a first grade level." Valadez testified that he believed what C.P. said, so he agreed that he was not going to interview "Mr. Finley for the truth, [he was] going to get a confession."
¶30 Prior to the interview, Valadez decided he was going to arrest Finley, but he wanted to avoid placing him in custody until he got a statement as "Miranda might be an impediment to getting a confession." Valadez also did not want Finley to have an attorney as he knew he probably would not get a confession if Finley had a lawyer. Valadez testified that he has no obligation to tell a suspect of the right to a lawyer when he does not have a person in custody.
¶31 On May 20, 2014, at approximately 8:45 a.m., Valadez and Vander Steeg went to Finley's home (without prior notice), where he lived with his mother. Finley's mother allowed the officers in and told the officers that Finley was in the bathroom. Valadez told Finley's mother that he and Vander Steeg needed to speak "in private" with Finley, and she left them alone in the kitchen.
¶32 Under the holdings in Hoppe and State v. Moore , 2015 WI 54, 363 Wis. 2d 376, 864 N.W.2d 827, I first consider whether the defendant had any relevant personal characteristics that would impact the voluntariness of his statements. At the time of the interview, Finley was obviously experiencing physically difficulties, telling the officers prior to the interview that he was sick and felt dizzy and, during the interview, that he could not "feel [his] arm on [his] left side" and was eventually taken by ambulance to the hospital.
¶33 Finley also suffers from significant mental deficiencies as supported by testimony from both Finley's aunt, a retired social worker who has extensive experience with Finley, and Dr. Roland Manos, who performed a psychological evaluation of Finley. Majority, ¶¶8-9. Finley's aunt testified that he needs additional direction to follow instructions, has a poor attention span, lack of judgment, cannot hold down a job, and is easily manipulated and "vulnerable to suggestion." Manos found that he functioned "within the borderline range of intelligence" and that he "has some significant-while not disabling intellectual limitations, there are certain areas that are more affected than others. And in his case, we did see problems with verbal comprehension, working memory, and processing speed." "Mr. Finley functions well below the average range in verbal comprehension, which is a measure of fund of knowledge, expressible vocabulary, and abstract reasoning." Manos agreed that if Finley "was interviewed by two officers that used a very particularized complicated interviewing technique designed to normalize the questions they're asking about deviant behavior, that is to say to minimize, um, certain deviant behavior in hopes of getting agreement with what the police officers are saying" that Finley would have had difficulty.
¶34 Given these personal characteristics, I next consider the pressures and tactics used by Valadez and Vander Steeg during the interview. The officers were trained to use the Reid technique with suspects and the Step-Wise technique[5] with victims. Police use leading questions with suspects as "a way of, I guess kind of getting more the truth out usually a lot of times, and its different techniques to ... see more the facts that happened."[6] The Reid technique is an interview and interrogation technique that begins with an "interview portion" which is a series of open-ended questions of who, what, when, where, why, and how's to get detailed information and potentially place the person at the scene. The second part is the "interrogation," which "is more so calling people out on errors that you find in their story and really focusing in on those errors where they're just glazing over a topic." "Those are usually areas where the person's lying, or trying to fabricate, or trying to prevent you from delving into too much because it's a sensitive area; and those are the areas you want to target."
¶35 Part of the Reid technique also has the interviewer observe "nonverbal clues" that reveal truthfulness or lying, i.e., how an interviewee sits, what his or her eyes "do," and "hand gestures." The Reid technique, according to Vander Steeg, teaches that when someone is telling the truth "they'll be yelling at you .... And sometimes they'll use profanity .... They start getting really irritated at being accused of something ... big part is they get aggressive." Valadez testified that he looks for nonverbal signs as well as verbal signs; if somebody is raising their voice and professing innocence that "might" be a sign that they're not guilty. However, the officers explained that during the interview phase, the police try "to break the person down a little bit," and during the interrogation stage, you "cut off denials." Although it appears contradictory, a "straight up" denial of an accusation is "a flag." Officers also provide the suspect with the "moral justification" for the wrong police say happened-you "give" the suspect the "reasoning" for what they did or "minimize" the wrong to imply to the suspect that what they were doing was not a big deal. Valadez admitted that he is not an "expert" on the Reid technique,[7] yet we accept this voodoo interpretation of nonverbal cues as evidence of reliability.
¶36 Despite knowing that Finley had the mental capacity of a twelve-year-old and social skills of the first grader, Vander Steeg and Valadez utilized the Reid technique in their interrogation of Finley. During the interview, Finley denied C.P.'s allegations at least three times. According to Vander Steeg, his strategy was to "at least to get [Finley] to admit that his hand did or his finger did touch her vagina. And it's by placing it as an accident, like it didn't happen on purpose" is how he gets the person to admit he or she was there or that it happened. Officers used the term "accident" or "accidentally" at least thirty-five times in trying to get Finley to say he touched C.P.'s vagina.
¶37 Once he got Finley to admit that he and C.P. were "roughhousing," Vander Steeg's strategy was to "minimize" and make statements like "[t]here's nothing wrong with roughhousing ... with a girl, is there?" In response to Finley's denials, Vander Steeg then told Finley that C.P. alleged that Finley inserted his finger into her vagina. Vander Steeg admitted that he knew that C.P. had not alleged that Finley inserted his finger in her vagina when he told Finley this information. Vander Steeg explained that he lied because an accidental touch is not a sexual assault, but if Finley admitted to putting a finger inside her vagina, then it is harder to call that an accident. When Finley again denied touching C.P.'s breasts or vagina, Vander Steeg challenged Finley with comments like "[C.P.] looks up to you and respects you," "I know you respect her as well. You wouldn't call her a liar or anything like that," and that it would be disrespectful to C.P. to say otherwise. Vander Steeg admitted that Finley's confession was arrived at "sort of progressively" and that "it was a lot of the interviewing, different angles and questions that we were asking him that ... it came out."
¶38 Under the totality of the circumstances, I would conclude that the tactics used by Valadez and Vander Steeg, notably the Reid technique with the lies, threats,[8] and manipulation, created a coercive environment that rendered Finley's statements involuntary. As our supreme court explained in Hoppe , "put together" "[t]he tactics used and the pressures exerted by the police were subtle and certainly not improper if used in the questioning of a person whose personal characteristics did not make him or her uncommonly susceptible to police pressures." Hoppe , 261 Wis. 2d 294, ¶59. Finley is not a common man; he is a boy with a man's age, and "the pressures created by the police conduct exceeded [Finley's] ability to resist." See id. , ¶58.
¶39 The police (because we have said they can do so) utilized deception, manipulation, threats, and outright lies after Finley repeatedly denied sexually assaulting his niece. They did so purposely in a noncustodial interview to deny Finley his Miranda warnings and to prevent him from having a lawyer. The police tactics used against Finley were coercive and improper, and I would find his confession to be involuntary.
¶40 Being a judge is a noble position. Being a law enforcement officer is a noble profession. There is something ignoble, however, in charging a person with a crime[9] if that person lies, cheats, or fabricates statements or evidence to the government during an investigation, but if a law enforcement officer does the same, we consider the confession reliable. In life, we do not trust a liar or a deceiver, yet we are imposing that character trait upon our police. Having authorized dishonesty, we must be prepared to accept dishonest results. Finley's interview was not an investigation; it was an inquisition. I respectfully dissent.

I use the word "interview" as it is the word used by the Majority and as the word "interrogation" is inappropriate to use as it has a constitutional meaning in a Miranda v. Arizona , 384 U.S. 436 (1966), custodial setting. We have a noncustodial case in which Miranda does not apply.

Miranda v. Arizona , 384 U.S. 436 (1966).

I object even to lies during custodial interrogations as demeaning to a civilized country, but I acknowledge the law says otherwise. Under Cook v. Cook , 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997), however, I can state my view that I believe it to be wrong.

"There are 'two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.' " State v. Ward , 2009 WI 60, ¶18, 318 Wis. 2d 301, 767 N.W.2d 236 (citations omitted). Admission of involuntary statements made during a criminal investigation violates a defendant's due process rights under the Fourteenth Amendment and article I, section 8 of the Wisconsin Constitution. State v. Hoppe , 2003 WI 43, ¶36, 261 Wis. 2d 294, 661 N.W.2d 407. "A defendant's statements are voluntary if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." Id. (citing State v. Clappes , 136 Wis. 2d 222, 236, 401 N.W.2d 759 (1987) ). The absence of Miranda warnings is a consideration. See Hoppe , 261 Wis. 2d 294, ¶56. We look to the totality of the circumstances to determine whether a defendant's statements were voluntarily. Id. , ¶38.

The Step-Wise technique is not used with a suspect as it is "strictly intended for victims of crimes so you don't ask leading questions." The Step-Wise technique is 180 degrees different from the Reid technique "[be]cause one's a victim."

According to the officer, leading questions are objectionable with victims as they suggest an answer rather than receiving "more the truth."

Which in itself raises significant Daubert v. Merrell Dow Pharm., Inc. , 509 U.S. 579 (1993), issues. If Valadez admits he is not an expert, then he is a lay witness. We do not allow lay witnesses to testify as to the truthfulness of a statement based upon how the declarant sat or moved their eyes.

From my perspective, the statements the officers made to Finley suggesting that if he did not agree with them then that would mean that Finley was calling C.P. a liar or it would be disrespectful to her to say otherwise were threats as to his relationship with his family and his niece, which taken in light of Finley's lack of employment history, etc., would be threatening to Finley.

Wisconsin Stat. § 946.41(1) criminalizes resisting or obstructing an officer and provides, in pertinent part: "[W]hoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority is guilty of a Class A misdemeanor." "Obstructs" is defined as "without limitation knowingly giving false information to the officer or knowingly placing physical evidence with intent to mislead the officer in the performance of his or her duty." Sec. 946.41(2)(a).